THE STATE OF MARYLAND, USE OF WASHINGTON COUNTY, *vs.* THE BALTIMORE AND OHIO RAIL ROAD COMPANY.— *December,* 1842.

The proviso in the 5th section of the act of 1835, chap. 395, "that if the said Baltimore and Ohio Rail Road Company shall not locate the said road in the manner provided for in this act, then and in that case they shall forfeit one million of dollars to the State of Maryland, for the use of Washington County," though assented to by the Company, does not constitute a case of contract, but a case of penalty, subject as to its enforcement to the will and pleasure of the Legislature.

It is a rule in the exposition of statutes, that the will of the Legislature is to be regarded, and carried into effect, so far as they keep within the limits prescribed to them by the constitution or fundamental law.

In ascertaining such will or intention, the rule is, that if divers statutes relate to the same thing, they ought to be all taken into consideration in construing one of them.

It is a rule in the construction of statutes, that all which relate to the same subject, notwithstanding some of them may be expired, or are not referred to, must be taken to be one system, and construed consistently.

The words of a statute are to be taken in their natural and ordinary signification and import; and if technical words are used, they are to be taken in a technical sense.

The term forfeit, in common parlance, strongly implies penalty. It is not the language of convention or contract, but is mandatory in its character.

The State, use of W. County, *vs.* B. and O. R. R. Company.—1842.

Although the right of expounding laws belongs to a different department of the government than the Legislature, still the sense of the Legislature, subsequently expressed upon the subject of laws of doubtful import, is a circumstance not entirely to be disregarded.

An act or charter of incorporation is nothing more than an offer until consummated by acceptance.

Where by act of Assembly a penalty or forfeiture is created for the benefit of a particular county of the State, it is competent for the Legislature to release or remit it after the forfeiture has occurred.

Such a releasing act is not an *ex post facto* law, nor a law impairing the obligation of contract.

A county is an integral part of the State, or portion of the body politic, and money received by her, would belong to her as public property, in her public political capacity, to be applied exclusively to the public use.

A county, as a member of the political family, has a right to participate in the legislative council of the State, but the will of the majority, when expressed according to the forms of the Constitution, is obligatory upon her, and to that will, as the rule of her conduct, she is bound to submit with becoming deference and respect.

A county is one of the public territorial divisions of the State, established for public political purposes, connected with the administration of the government—the money it receives in that character is public property, to be used for public purposes only, and not for the use of its citizens individually. In that relation they would have no immediate interest, and could assert no title.

No penalty incurred during the continuance of a law can be enforced after its expiration or repeal, without a saving clause or special provision to that effect.

A contract made by the State, for the use and benefit of one of its counties, is not within the perview of that part of the Constitution of the United States, which prohibits a State from passing any law impairing the obligation of contract, so far as to prevent the Legislature from releasing it at pleasure, or discontinuing an action brought for its enforcement in the name of the State.

To declare an act of a co-ordinate department of the government an unwarrantable assumption or usurpation of power, because it is a violation of a constitutional provision, is an exercise of the judicial office of a grave and delicate nature, which never can be warranted but in a clear case.

APPEAL from *Frederick* county court.

This was an action of Debt, instituted by the appellants on the 1st February, 1841, in the *debet* and *detinet*, for the sum of one million of dollars.

The plaintiffs claimed to recover the sum declared for, under the 5th section of the act of 1835, chap. 395, passed on the

4th June, 1836, entitled, "an act for the promotion of Internal Improvement." The 1st section of which enacted :

"That if *the Chesapeake and Ohio Canal Company* and *the Baltimore and Ohio Rail Road Company*, in general meeting of said corporations, respectively assembled, shall approve, assent and agree to the several provisions of this act, so far as they are applicable to said corporations respectively, and shall severally communicate said approval, assent and agreement, under their corporate seals, and the signatures of their Presidents, to the Governor of this State, on or before the 1st day of August next, the Treasurer of the Western Shore of *Maryland* shall subscribe to the capital stock of each of said corporations, the sum of three millions of dollars, and pay for the same in the manner, and upon the conditions hereinafter mentioned ; and from the date of the said subscription, the stipulation heretofore made by the *Baltimore and Ohio Rail Road Company*, and so much of the act of Assembly heretofore passed, restricting the said company from proceeding with the construction of its rail road in the valley of the *Potomac River*, above *Harper's Ferry*, until after the *C. & O. C. C.* shall have finished its canal to *Cumberland*, or otherwise, or *the time limited by law for its being completed to said town shall have elapsed*, as imposes said restrictions, or is inconsistent with the provisions of this act, be null and void, and the said rail road company may thenceforth proceed with the construction of its work *pari passu* with, but without preceding the construction of the said canal or its works in the said valley, where the said rail road and canal, or then works, will be in juxta position ; and, &c.

Sec. 5. *And be it enacted,* That the said treasurer shall be, and he is hereby authorised and directed, to pay from time to time, upon the requisition of the president and directors of said companies respectively, after six months notice, not exceeding one million of dollars to each of said companies, in any year, in the whole not more than three millions of dollars to each of them, out of the money which he shall receive as the par or sum of the State's stocks or bonds that may be issued or disposed of, for the purpose of providing the amount

of subscriptions aforesaid, to the stocks of said companies, and that the said several subscriptions and payments for the said stock of each of the said companies are hereby authorised and directed only upon the condition, that none of the rights and remedies of this State, under any contract now subsisting between the State and either of said companies, shall be in anywise impaired, waived, relinquished or affected by reason of this act, or of any thing that may be done by either of said companies, in consequence thereof; and the said treasurer shall not make any payment aforesaid, for subscription to the stock of the Baltimore and Ohio Rail Road Company, until after a majority of the directors appointed therein on behalf of this State, shall have certified to the treasurer in writing, supported by the oath or affirmation of a majority of said directors, that they sincerely believe in their certificate and statement, that with the subscription by this act authorised to be made to said company's stock, and with the subscription which the city of Baltimore may have made by virtue of an act, passed at December session of the year eighteen hundred and thirty-five of this Assembly, or that independently of any subscription by any other public authority than the city of Baltimore, as aforesaid, and of the cities of Pittsburg and Wheeling, and exclusive of any loan secured to it, exclusive of all future profits and debts due by the company on interest, the said Rail Road Company in their opinion have funds sufficient to complete the said rail road from the Ohio river, by way of, and through Cumberland, Hagerstown and Boonsborough, to its present track near to Harper's Ferry; and it is hereby declared to be, and made the duty of the said company to, and they shall so locate and construct the said road, as to pass through each of said places; which certificate of said directors shall be accompanied by an estimate or estimates of one or more skilful and competent engineers, made out after a particular and minute survey of the route of said road by him or them, and verified by his or their affidavit, shewing that the whole cost of said work will not be greater than the amount of funds the said directors shall certify to have been received by said company, and appli-

cable to the construction of the said road; *Provided, that if the said Baltimore and Ohio Rail Road Company shall not lo_cate the said road in the manner provided for in this act, then and in that case they shall forfeit one million of dollars to the State of Maryland, for the use of Washington county.*

The plaintiff declared upon the act of 1835, and alleged, that the defendants had not so constructed and located their road as to pass through *Cumberland, Hagerstown and Boonsborough*, as directed by the said 5th section. Errors in pleading were waived.

The defendants pleaded—1st. *Nil debet.*

2nd. That since the last continuance, the Legislature of *Maryland* had passed the following law, to wit:

*An act to repeal certain parts of the act, entitled, an act for the promotion of Internal Improvement, passed at December session eighteen hundred and thirty-five, chapter three hundred and ninety-five.*

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That so much of the fifth section of the act, entitled an act for the promotion of internal improvement, passed June four, eighteen hundred and thirty-six, chapter three hundred and ninety-five, as makes it the duty of the Baltimore and Ohio rail road company to construct the said road, so as to pass through Hagerstown and Boonsborough, be and the same is hereby repealed; and that the forfeiture of one million of dollars, reserved to the State of Maryland as a penalty, in case the said Baltimore and Ohio rail road company shall not locate the said road, in the manner provided for in that act, be and the same is hereby remitted and released, and any suit instituted to recover the same sum of one million of dollars, or any part thereof, be and the same is hereby declared to be discontinued, and of no effect.

SECTION 2. *And be it further enacted,* That the State of Maryland hereby reserves the right, if after the completion of the said rail road to the Ohio river, the Legislature should deem it expedient to require the said Baltimore and Ohio rail road company to construct a lateral road or branch from some con-

404    CASES IN THE COURT OF APPEALS

The State, use of W. County, *vs.* B. and O. R. R. Company.—1842.

venient point of the main stem up the Antietam valley to Hagerstown ; *provided*, the said lateral or branch road can be constructed at a cost not exceeding the sum of three hundred and fifty thousand dollars, including damages for the right of way.

And thereupon pray judgment, if, &c.

The parties then filed a statement of facts, with an agreement, that the county court might enter a judgment *pro forma* for the defendants. The questions decided by the Court of Appeals render it unnecessary to publish the statement of facts.

The county court rendered final judgment for the defendants, and the case was brought to this court upon appeal by the plaintiffs.

The cause was argued before STEPHEN, ARCHER, DORSEY and CHAMBERS, J.

JERVIS SPENCER, for the appellant, contended—

1. The act of 1835, chap. 395, sec. 5, by force of the words, "Provided, that if the said *Baltimore and Ohio Rail Road Company* shall not locate the said road in the manner provided for in this act, then and in that case they shall forfeit one million of dollars to the State of *Maryland*, for the use of *Washington* county"—the same accepted by the company is a contract. The case 4 *G. & J.* 128, shows the rules on this subject. The words "approve, assent and agree to," in the *first* section of the act of 1835, as the condition to give effect to the whole act, make a contract on the part of the appellees.

2. *Washington* county is a party to that contract she is really and beneficially interested. It is for her peculiar benefit. It resembles an agreement made between A and B, for the benefit of C, who may sue *suo jure*. A consideration need not be paid by the beneficiary. A benefit moving to the *Rail Road Company* is sufficient to bind her at law. And there is a consideration as to *Washington* county. The relation between her and the State, is like that of parent and child. The State, as parent, is the guardian of the counties. No consideration,

however, is necessary in this action. The rules of construction are generally applied alike to all descriptions of contracts. 4 *Gill & John.* 151. The case of *Green vs. Biddle*, 8 *Wheaton*, 1, is conclusive upon the question at bar. The act of *Kentucky*, attempting to overrule rights vested under the compact between *Virginia* and that State, was held void.

Where a trust is created for the benefit of a person, though without his knowledge at the time, he may affirm the trust, and enforce its execution. *Neilson vs. Blight*, 1 *John. Cas.* 208.

An assignment may be made of a contract without consideration. The State may assign at pleasure to *Washington* county, and that county pays a consideration, for she pays a tax under the act of 1835, or rather, is liable to pay it. If the State had not interposed under the act of 1840, no question could have been raised under the act of 1835.

3. The forfeiture in the act of 1835 is in no sense a penalty. It is not for any criminal or prohibited act amounting to a public offence. It is not introduced *in terrorem*, but is a sum to be paid for using the license given by the act, as a compensation to the injured party. *Green vs. Biddle*, 8 *Wheat.* 89. 2 *Poth. Oblig. Evans' notes*, 81.

4. That by the use of the license by the company, *Washington* county acquired a vested right in the sum stipulated to be paid. *Whittington vs. Polk*, 1 *Harr. & John.* 246. *Providence Bank vs. Billings & Pittman*, 4 *Peters*, 561. *Canal vs. Rail Road Company*, 4 *G. & J.* 142.

5. That to take away this right from *Washington* county would be inequitable, unjust, and contrary to the first principles of the social compact; and therefore the act ought to be so construed, if possible, as to avoid that result, and it may be so construed by confining its operation to whatever right this State had, if any. The State might release her own power over the matter, leaving in force the right of the county. *McMechen vs. Mayor, &c., of Baltimore*, 2 *Harr. & John.* 41. *Calder and wife vs. Bull and wife*, 3 *Dallas*, 387. *State of New Jersey vs. Wilson*, 7 *Cranch*, 166. *Fletcher vs. Peck*, 6

*Cranch,* 130.   *Town of Pawlet vs. Clark,* 9 *Cranch,* 335. *Hampshire vs. Franklin,* 16 *Mass..*84.   1840, *ch.* 260.   *Moseley Rep.* 43.   *Winch vs. Kirley,* 1 *Term Rep.* 358.   *Legh vs. Legh,* 1 *Boss. & Pull,* 447.   *Carter vs. United Ins. Co.* 1 *J. C. R.* 463. *Owings vs. Piet & Low,* 5 *G. & J.* 134.   1 *Wheat.* 233.   *Eels vs. Finch,* 5 *John. Rep.* 193.   *Andrews vs. Beecker,* 1 *John. Cases,* 411.   *Wardell vs. Eden,* 2 *John. Cases,* 121.   *Kiersted vs. State, use of Costello,* 1 *G. & J.* 231.

6. If otherwise construed, it is repugnant to the State Constitution, and void.

7. In the same view it is repugnant to the Constitution of the *United States,* and void.

PRICE, in continuation, for the appellants—

The case is of importance from the amount involved, the dignity of the parties, and the novelty of the questions.   It affects *Washington* county, an important member of the State, on the one hand, and one of the most extensive chartered companies of the State, on the other.   The State exercises authority over both, and all must notice that the inquiries here are of grave interest.   We are obliged to go down deep into the foundation of civil government, and it is fortunate for all, that we may here examine them calmly.   In this place, government is no mystery, each citizen may enquire into it.   I prefer a claim of right on behalf of *Washington* county, one of perfect obligation.   The court have no favors to confer. They must declare the right.   The history of our right is brief. The claim grows out of the act of 1835.   A grant of three millions was made by the State, on condition, to the appellees; a part of the condition was to construct a road through *Washington* county; another condition was a forfeiture of a million of dollars to *Washington* county, in case the road was not constructed.   To this was superadded the necessity of consent by the appellees—the appellees assemble and approve and agree to the provisions of the act of 1835.   This was done in the form and manner prescribed.   An agreement was made as declared by the act of 1835.   You cannot withdraw that stipulation from the law, and so destroy its symme-

try. It was a general scheme. It contained grants to general schemes of improvement. All parts of the State were to share and participate. The act was full of compensation and compacts from first to last. There was no provision of that act which could be carried out independently; they were interlaced, each the consideration of the other. No compensation was granted, but as the co-relative of some other provision in the same act. See the 8th section. None should begin until all were ready, and this affected several schemes of improvements. A million of dollars was held sacred, and faithfully pledged to internal improvements on the *Eastern Shore*, at any rate. This is a compact—bargain if you like. The basis of a scheme of burthens and benefits to be distributed. Hereafter the *Eastern Shore* may claim her million. Such bargains are fair, if open, and equitably conducted. People may so agree. It is a partnership of profit and loss, and included in one contract. Modern legislation is full of such compacts. *Maryland* covenanted as to the *Western Lands*, and on this condition came into the Union. She was first guarantied. So as to slaves, which affected both representation and direct taxation under the Constitution of the *United States*. Communities rally on such points, and there is no want of morality in the mode of settling the question. *Baltimore* is not the whole State. The act was to benefit her, and hence the equivalents given. It was all right, if adjusted openly and honorably. If wrong, the *Baltimore and Ohio Rail Road Company* is not here to read us homilies. She obtained her three millions as the equivalent of other grants. She cannot chide this as sectional or sordid legislation. She was to agree to it, and all its provisions. She might refuse and defeat the law. It depended upon her assent to become a law. That assent perfected the act of 1835. The law was not passed in haste. It was proposed. The Legislature adjourned in April, and re-assembled late in May. The members went home—saw their constituents—held a sort of family council—came back, and thus sanctioned the act of 1835. They even proclaimed the mode in which they would levy taxes, if necessary; they awarded compensation

in various instances. All considerations as to the moral of the act apply with equal force to both parties here. The same principles must apply throughout. The Legislature of 1835 had no design to perpetrate a fraud, or to practice a joke, and no disguise. Her proposals were accepted. They proposed a duty to be performed towards *Washington* county. Its failure was accompanied with a forfeiture. The means of discharging that duty were provided. The Legislature could do no more for *Washington* county, yet the possible departure of the *Rail Road* from *Maryland* was anticipated, and now that company is as much bound to pay, as to go on with her great work.

What did the Legislature intend? Intention and construction are synonimous. We do not enquire what the *B. & O. R. R.* intended. Can it be said as respects *W.* county, that this act was a fraud and a jest? Take that stipulation away, and the system of contemplated improvements is destroyed. This is the worst sort of repudiation. If you can take away this million, why not the entire loan? Why not repudiate the bonds given to *R. R.* company? There is no compensation proposed to *Washington* county for the loss of the road. The company went into *Virginia,* and there expended large sums of money, which cannot be recalled. This is submitted to, and *Virginia* compels them to go on, and not to enter their State west of *Cumberland.* How was it that *Virginia* exacted such results? It looks like contrivance. It was asked for as a means to use before the Legislature of *Maryland.* They made a case of *vis major.* I do not make the charge, but it looks like it, and when I speak to the morals of this controversy, I am at liberty at all points of the case, and the conduct of the parties concerned.

Is the act of 1835 a contract or not? A State may contract by legislation, with a State, individual, or a corporation. This rule is admitted on all hands. Legislation and contract are different in their natures. The Legislature contract for the State, and not for the Legislature. In contracts they act as agents for the State. A contract as guarantied by the Constitution of the *United States.* A contract binds *per se.* A State cannot break a contract. It is sacred from State power.

The act of 1835 embodies terms of contract between the *State* and the *B. & O. R. R. Co.* Is the stipulation in favor of *Washington* county, a contract or not? Grant that it is a contract, and there can be no further difficulty in this case. *Washington* county is a party to that contract. The *R. R.* company was required to agree; upon that condition the Treasurer subscribed to the stock of certain companies. The premium in favor of *W.* county was not a new thought in 1835. That county was always regarded in the system of *Maryland* improvements. The assent of the company made a contract. *Neilson vs. Blight,* 1 *John. Cas.* 205. *Moses vs. Murgatroyd,* 1 *J. C. R.* 129.

The county may avail herself of the contract, though not made with her. 1 *Kent Com.* 391, 392.

The prohibitory clause in the Constitution of the *U. States* extends to contracts, with trustees, for third parties, though the trustee is not benefitted.

*Maryland* proposed a contract by the act of 1835. *Canal vs. Rail Road Company,* 4 *G. & J.* 129.

The assent makes a contract. The company assented without qualification to the contract as tendered her. It covers all the stipulations in that law, and makes an entire contract. Was there any consideration for it? If accepted under seal, it is a specialty, and imports a consideration. So if the acceptance made a contract. 2 *Black Com.* 345.

There was a grant of three millions, which is consideration, and enough too. This was received and held by the company. The law forms the contract, and shows its terms. It was made by the Legislature as the contracting party. The statute is a specialty. *Com. Dig. Tit. Debt A, No.* 1, *No.* 4. 1 *Saunders Rep.* 38. *Cro. Chas.* 513.

No consideration necessary to create a trust declared on the face of the instrument, making the trust. 24 *Law Lib.* 56.

Here there was a consideration of damage to *W.* county, from failure of road through the county. Old roads and improvemements destroyed. It is a meritorious motive, property destroyed should be paid for.

The penalty imposed by the act of 1836, is not for a political offence, nor for a criminal act, nor *in terrorem.*  It arises upon contract, and is stipulated damages, intended to be paid. The act of 1840, chap. 260, confirms this idea.  It uses the words, remit and release; hence, the penalty had accrued, or it could not be released.

In the construction of laws, we ask what the intention of the Legislature was?  *Plowden,* 465.  2 *Evan's Poth.* 79, 81, 82, 83.

It is then stipulated damages, and all is recoverable or nothing.  There is no power to break the contract.  The Legislature did not intend to do more by the act of 1840, than release public rights; more is a nullity.  It is violence and not law.  This is a vested right, and not to be disturbed.  It is contrary to natural justice to impair our contract.  The Legislature cannot interfere; it cannot unmake a contract.  The sovereignty is limited; we have a written constitution, and not an absolute government.  All is compact.  Every power comes from agreement.  *Regents University of Md. vs. Williams,* 9 *G. & J.* 408, 409.

It is against the social compact and natural justice, to take away vested rights.  *Town of Pawlit vs. Clarke,* 9 *Cranch,* 292.

To dismiss a suit is a judicial power.  *Calder vs. Bull,* 3 *Dallas,* 387.

The act of 1840 is against the Constitution of the *United States.*  An act rescinding a contract is repugnant to it. *Fletcher vs. Peck,* 6 *Cranch,* 136.

Statutes are not retrospective.  The law giver cannot alter his mind as to a vested right.  *Dartmouth College vs. Woodward,* 4 *Wheat.* 576.

Grants are construed as contracts executed or executory. *Regents of University vs. Williams,* 9 *G. & J.* 365.

Then, as to the power of the trustee to strike off the suit in a court of law.  This is traditional law.  The courts will protect the rights of equitable plaintiffs against a legal plaintiff; will examine into the right, and that established, they will not

disturb it. The assignee uses the name of the assignor, as an incident of the transfer, and courts protect assignments. Can a naked trustee, a party in that interest, dismiss the suit? Here the State is a mere trustee, and we have no remedy but in her name.

NELSON for the appellee—

The defence to the claim asserted under the act of 1835, arises under the act of 1840, chap. 260, a repealing law. It is clear, if the act of 1840 be a legitimate exercise of power, the judgment below must be affirmed. The act of 1840 repeals the proviso of the 5th section of the act of 1835; remits the forfeiture, and dismisses the suit which had been brought under the act of 1840, hence no pretence of right of recovery now. By the charter of the *B. & O. R. R. Co.*, 1826, chap. 123, the road was to be commenced in two and finished in ten years, to connect *Baltimore* with the *Ohio river*. The charter was adopted by *Virginia* in 1827, and continued to 4th July, 1838. By the act of 1827, chap. 104, sec. 3, a subscription was authorised of half a million of dollars, on condition that the road should pass through *Frederick, Washington* and *Allegany* counties. By the act of 1831, chap. 251, the Legislature released the company from the obligations of the act of 1827. By the act of 1835, chap. 127, she authorised *Baltimore* to subscribe three millions of dollars to this work, and *Baltimore*, in 1836, subscribed her three millions. The act of 1835, chap. 395, passed on the 4th June, 1836, contains the conditions on which that act is to go into operation, and it was assented to by the company on the 18th July, 1836. *Virginia*, in 1837, authorised a subscription of $302,100, by her board of public works. By the act of 1837, chap. 314, 29th March, 1838, *Maryland* proposed a modification of the act of 1835, in view of further action on the part of *Virginia*. The act of 1837 never was accepted. The act of *Virginia* of 1838, chap. 159, extended the time of construction to 4th July, 1843, and also subscribed a sum of $1,058,420. In *October*, 1838, the directors of *B. & O. R. R. Company* communicated

their estimates upon oath. The act of 1837 proposed to commence at *Cumberland* and proceed west.

In 1840, to September term *Washington* county, brought a suit to recover this penalty, which was dismissed.

On the 1st February, 1841, she brought a second suit in *Frederick* county, and on the 10th March, 1841, the act of 1840, chap. 260, was passed.

The right to repeal such laws lies at the foundation of government. It involves no question of integrity any where.

Under this state of facts, I propose to maintain three propositions:

1. That the proviso of forfeiture in the act of 1835, imposes a penalty, and is not in the nature of contract.

2. If a penalty, the Legislature could, and did remit it by the act of 1840.

3. If a contract, the Legislature was competent to release it, and did release it by the act of 1840.

What is forfeiture? The act need not be criminal which is followed by forfeiture, or it may be criminal only because it is prohibited. In 1806 Congress prohibited intercourse with *St. Domingo.* The law declared vessels there trading subject to condemnation. Public policy demanded this. The forfeiture was penal—it was for a violation of law. Penal forfeiture is a punishment annexed to some illegal act, some violation of sovereign power. Is the act of 1835 a contract, or does it impose a penalty? The State is bound by her contracts. These are inviolate. Again, test the act of 1835 by the rules of interpretation.

The terms are, "then, and in that case they, the company, shall forfeit one million of dollars." This is for a violation of a prescribed duty. It depends upon the execution of a public duty. It is a penalty prescribed for non-performance of a public duty. The acts of 1837 and 1840, treat this as a penalty, and that of 1835 furnishes a rule for its own interpretation. It was the duty of the company to pursue a particular route. The Legislature, when dealing with contract in the act of 1835, 9th sec., use clear language, as stipulate, agree and bind, and so

in other laws, and these terms stand in opposition to forfeit-ure—forfeiture is used where a penalty was designed.

Then as to the assent required of the *B. & O. R. R. Com-pany* to the act of 1835; does that make a contract? The company assented to the act as they found it. They agreed to the law in form, manner and substance, as it was enacted. The assent does not make a contract where there was none previously—none proposed. The penalty may be repealed without violating the charter or impairing the contract with the company. 9 *G. & J.* 388.

There is no bounty but to *Washington* county. All the other grants are for equivalents, payment of interest, indemnity. In-terest and principal are both to be paid. But the county de-mands the money without any equivalent. She proceeds to enforce a penal forfeiture.

Then as to the effect of the act of 1840, chap. 260, opera-ting upon the penalty of the act of 1835. It remits it; re-leases the penalty. If it be legal, the penalty is gone. If a penalty, and not matter of contract, the right is gone. 9 *G. & J.* 388.

The corporation is a private one; but the grant was for a public benefit alone, and of course is under public control. This position is well maintained every where. 2 *Black Com.* 436, 437. Penalties are to be recovered in popular actions. Where there is an informer, the King can only remit before action brought, but Par'iament may at any time. 1 *Sir Wm. Black.* 451.

The Legislature may repeal the penalty at any time. The power to remit resides in the sovereign will, the Legislature. Public interest and police regulations are confided to the Le-gislature. 1 *Cranch,* 103, 104. 5 *Cranch,* 281. 6 *Cranch,* 329, 203. 2 *McCord,* 1.

If the law be repealed, the party is not punishable. The law must remain in the same state at time of action instituted, as at time of judgment. 2 *Bayley,* 564. 1 *Missouri,* 235.

The State is a trustee for *Washington* county, and may dis-pose of the penalty at pleasure. She may take the money of

any county before or after it is due. She may alter its direction, or release it at pleasure, before or after judgment. A county is but a part of the political power of the State.

The Legislature may repeal penalties and defeat judgments founded upon them. *Breeze*, 114. 1 *Marsh*. 465. 1 *Stew. Alab*. 347. 2 *Stew. Alab*. 160. *Adam New. H.* 61.

Suppose the act of 1835 imports a contract, is the repealing law constitutional?

The cases cited could not apply. Much here depends on the character of the parties. The power of repeal relates to that character. It is not the case of a citizen of *Washington* county. But it is the community of *Washington* county in their public character as public agents—as a political corporation. Its power is not inviolable. This is not a case within the Constitution of the United States in regard to contracts. A county is created for municipal and political ends; to promote general interests in a particular mode, but it has no being independent of the State, who creates and may annihilate it. 9 *Cranch*, 43. 4 *Wheat*. 629, 659, 693, 694. 1 *Missouri*, 239. 13 *Wendell* 337, 325.

The case of the *Mayor* and *City Council of Baltimore*, vs. *Robert Lemmon*, June term 1838, by which the auction duty law, taking away the fund from the city and transferring it to the State was sanctioned, forecloses this question and fully sanctions the act of 1840.

F. A. SCHLEY also for the appellees—

The act of 1840 was passed deliberately, and is not to be assailed lightly. If the constitutionality of that act is doubtful, this court will maintain it. 6 *Cranch*, 128.

If doubtful on that point, it is a controlling principle in favor of the act. 4 *Peters S. C.* 549. 3 *Dallas*, 394. 1 *Bald. C. C. R.* 74. 3 *Sumn*. 120. 2 *Gallison*, 554, 5.

Many cases of contract have been decided not to be within the Constitution of the United States. 4 *Wheat*. 643, 644. *Bald. Con. Views*, 141. 4 *Peters*, 563. 3 *Peters*, 289.

A contract to be within the protection of the Constitution of the United States, must be express; an implied contract is not within it.

But in the act of 1835, which was for the general improvement of the State, there was no contract in the particular case relied on. The assent to the whole law does not make a contract in any case except where the act intended to make a contract. The rules which relate to the construction of statutes sanction these views. *Dwarris on Stat.* 707. 8 *Barn. & Cres.* 74. 5 *Rep.* 119.

In the 5th section the language is, you shall forfeit. This indicates penalty. The enormous sum is *in terrorem.* It is not a vested interest as in contract. It is also a forfeiture to the State, and in statutes the word forfeiture is ever used in connexion with fine and penalty. The act of 1840 unlocks the legislative mind, and shows that penalty only was designed by the act of 1835. Then again, if a contract, it is with the State, and the power which originated, may release it. *Washington* county paid no part of the consideration. The commissioners who assert the right to the fund here, are but arms of the State; a public corporation; a political body. Establish them to be a municipal corporation, with public powers, and there is an end of the question. In the case of the dissolution of a public corporation, Chancery interferes only to protect private property under its care. *Angel on Corp.* 8, 40. 9 *G. & J.* 397.

The community of *Washington* county could not use this money without legislative direction. The forfeit was to *Maryland.* The use and application of the fund must still be defined. How would the county take this money from the Treasury?

The delegated power to sue may be revoked by the Legislature at any time before judgment. 2 *Bayley,* 584. 3 *Wheat.* 319. 10 *Wheat.* 289, 304.

The levy courts or commissioners of counties can only receive money by authority of law. All their powers are express, and all subject to legislative revocation.

R. JOHNSON also for the appellees—

1. The act of 1835 constitutes a penalty.

2. If a penalty, then under the control of the Legislature.

3. If a contract, then the party for whose use the contract was entered into is not a party to it; or if a party, has no such interest as is protected by the Constitution of the *United States,* or *State of Maryland,* or the first principles of the social compact.

4. If a contract, then at law under the control of the Legislature of *Maryland,* because of the public character of the *c. q. use*—*Washington* county—without question so far as that county is concerned.

Is the proviso a penalty? If so, as contradistinguished from contract, it is not denied to be within legislative control. Is it penalty or contract? To determine this the whole law must be examined; anterior and subsequent legislation enquired into. The whole range and history of this particular legislation may be regarded to determine the legislative intent. 1 *Wheat.* 116.

I propose first to look at the history of the enterprise which creates the claim now asserted. *Maryland* and *Baltimore* saw that the tendency of internal trade was out of her territory. Both, were deeply interested in its increase, and in 1827 they started upon an untried enterprise. The act of 1826, chap. 123, sec. 14, prescribes the powers of the appellee's incorporation and its objects. It was to construct and keep in repair a rail road. Immediately after its passage the company sent to *Virginia,* and on the 8th March, 1827, obtained a similar incorporation. *Virginia* and *Maryland* both looked to the *Ohio river.* An authority from *Pennsylvania* was also necessary, and on the 27th February, 1828, it was also obtained there. By each State a limitation of time was affixed, within which to undertake and complete the work. Undertakings of this character were then in their infancy. This was the first great enterprise, and it looked to the achievement of a work co-eval, with the formation of our government; a connexion by some mode of the Atlantic and Western waters, which was to bind us together as a single nation.

The State commenced with a subscription of half a million of dollars. Individuals subscribed three millions, and we are yet to be informed that either had a local habitation in *Washington* county. The line of the route was prescribed. The choice of route with the *Ohio Canal Company.* The work went on, and came up to 1835, when further means were essential. The benefit of the road no longer doubted, neither the capacity to make it. But where are the means to come from? $240,000 per annum were now at hazard, lost, if the rail road did not go on. Now the State came into a family council to furnish means to complete both works; not to save *Washington* county? Did the Legislature, in 1835, believe or not that it would take three millions of dollars to accomplish each undertaking, and then give a million of dollars to *Washington* county? Would they raise the money for that county? What to be done with it when raised? How to be applied? There was no authority to apply it without law. The money could be neither distributed nor paid. What lawful use could be made of it. *Washington* county is incorporated for political objects; a civil institution with no general powers. Did *Maryland* legislation put it into her power to arrest the work of improvement forever? Did it make a contract with that county out of the power of the Legislature? If out of the State's power now, it was equally out of her power one day after the passage of the law. If *Washington* county is a party, and had an interest in that contract, she had it from the acceptance of the law.

By the act of 1825, chap. 180, a board of public works was created. It was the parent of many ills. The 21st section authorised a large sum to drain the low lands on the *Eastern Shore,* and complete plans for opening the navigation of certain of our rivers in that part of *Maryland.* Who ever dreamed that this could not be repealed? A grant for specific improvements, specific appropriations for specified objects, to be made by officers of the State. The Legislature used the language of contract. The faith of the State was pledged. If possible to give validity to the act, the State seemed bound to give it, and bound to hold the grant exempt from legislative control,

and the counties on the *E. S.* were just as competent in that case as *Washington* county, under the act of 1835, to demand it.   Yet it has not been so treated at any time.

By the act of 1835, the Legislature prescribed a route for the rail road company, through *Cumberland, Hagerstown* and *Boonsborough.*   It was made the duty of the company so to locate their road as to pass through all those points, and a failure to do this in the manner provided for in that act, forfeited one million of dollars to *W.* county.   *Washington* county was not the only county concerned in the matter.   The provision is more extensive than her territory, and hence no contract for her benefit peculiarly.   She had no interest in the *Cumberland* part of the road.   Now to have avoided *Cumberland,* would just as effectually have fixed the forfeiture as passing by *W.*   If this is contract, no other interpretation can be given to it.   You must consider, and comply with the whole law.   It is the whole route which constitutes the prescribed duty.

After a minute consideration of various other sections of the act of 1835, the counsel proceeded to inquire to whom the duty of locating the road through the places designated was due. The county had no right to prescribe it.   The franchise exists only by virtue of the sovereign power of the State.   It was sovereign power communicated to the subject, competent to make contract, or enter into the stipulations of the act.   *The whole error in the argument on the other side is, in supposing the State not a party interested in the performance of the prescribed duty.*   If *Washington* county could not release, the State could ; else we should have a public duty without the power of modification.   Why was there not a direct forfeiture to *Washington* county?   She was capable of taking, and yet it was not given to her.   Why was the State interposed?   If the duty is let off, the penalty is.   The million forfeit would not come out of the coffers of the rail road company.   Then it was bankrupt.   State aid alone could maintain her.   *Washington* county, it is said, comes into the family compact—family councils.   For what? To get her payment from individual stockholders?   No.   Their payment was to come out of *Maryland ;* out of the three millions which the State then proposed to give the company.

The authority of a sovereign to withdraw a gift until it is actually received, is settled in the case of the *Canal and Rail Road Co.,* 4 *Gill & J.* 1. *U. S. vs. Morris,* 10 *Wheat.* 301, 304.

The State may legislate on the subject of remedies. So the right of arrest is under State control. The penalty is a remedy for the performance of a contract; for the performance of such a contract as existed under the law with the rail road company. 4 *Wheat.* 200.

The destruction of a penalty does not affect a contract. That remains in full force wherever the duty to perform remains. There may be acts of wrong, accompanied by forfeiture, recoverable in particular modes. The modes may all be altered without affecting the forfeiture. Fines, penalties and forfeitures are often the readiest mode of enforcing laws, and if the right to modify them at discretion is abandoned, government is stripped not only of its most effective powers to enforce, but also of its right to exercise mercy. The power of mercy exists in all civilized countries. If it exists as a power, it must be in the government, as a government: in that which may create the forfeiture. The right to secure performance of duty is clear; it as part of the one sovereignty. It is not denied that government may release all forfeitures, and yet, though this is a forfeiture—so called in terms—with all its incidents, the argument is that all here rests upon the will of *Washington* county. 10 *Wheat.* 292.

I maintain there is no contract here which *Washington* county could have enforced in a court of justice, and if a contract, the power of *Maryland* was competent to change it in this case.

Under the Constitution of the United States, those powers in which the States have no concurrence, are all vested in the general government. There are also cases in which the States share the power with the United States. There is, however, a large mass of public powers not touched by the constitution of the general government. Usury, gaming, marriage. All contracts existing under the State laws, are regulated at the discretion of the States. What contracts shall be binding is exclusively between the States and their own citizens. 4 *Wheat.* 629.

It must be property or something of value, which the party claiming may go into a court of justice to enforce as a right of property, or claim as a thing of value. This is the sort of contract covered by the Constitution of the United States. Could *Washington* county enforce this contract in that aspect? If the act of 1835 had remained in one sense, it might have been done as in the name of the State. Why may *Maryland* sue; because she becomes a party on the happening of the contingency. *Washington* county could not sue *Maryland.* The distinction is as between the obligation of a contract, and the remedy to enforce it. Does there exist a contract binding with reference to the general law, as between *Washington* county and the State. This is necessary, a consideration is necessary in all cases of contract. The mere moral undertaking is not the subject of remedy. Gifts *inter vivos* are not enforced in a court of justice. 2 *Gill & John.* 208, 206.

As between *Washington* county and the State, there was no consideration, no duty moved from the one to the other. Nothing passed, and hence no contract as between them within the Constitution of the United States.

Was there a consideration in fact? Did the State, by the act of 1835, lose dominion over the subject, by which the million of dollars were to be forfeited. The intent was, that if the route specified was abandoned, the money was to go into the Treasury. The forfeiture is to the State. The legal dominion is in the State. So the legal control. Why not payable to *Washington* county. It might not be for the interest of the State, that the original route should be followed.

What is the character of the claim between the State and *Washington* county? Did she give any thing for it? Did she lose any thing to obtain it? There was a time when loss of trade and travel was a cause of action, but not so now in such cases as this. The grant is founded on natural love and affection. The State acts as *parens patriæ.* It is a gift in all its terms—reasons. No consideration—no contract. The stock belonged to the State, and remained with her until after the period of forfeiture. *The Baltimore and Ohio Rail Road Company* could only pay to the State.

Is the form of the grant, by act of Assembly, so conclusive that its consideration cannot, under the circumstance of this case, be enquired into? If it be so, how have various rights been waived in *Maryland* as to rail roads? Turn to the pension act; resolutions to pay for services rendered. Who doubts the right to repeal, whether granted in the form of an act or resolution? The acts of 1785, chap. 17, and 1813, chap. 17, were passed in the language of contract, and changed. It is of no consequence about the form, so long as the dominion remains in the State, and though in form contract, yet unexecuted. The State may change it.

Funds for free schools in all the counties of the State, have been modified in every form at the pleasure of the Legislature, and the power has never been doubted. 1821 chap. 131, sec. 10. 1836, chap. 220. 1837, chap. 285. So of the surplus funds set apart for sinking fund. 1832, chap. 175, sec. 9. 1838, chap. 390, sec. 4. 1839, chap. 33. 1839, chap. 40. The power not questioned, though not expedient. New counties have grown up, and their funds have been distributed anew at the pleasure of the General Assembly.

Then if contract, was it a contract out of the legislative power, because of the Constitution of the *United States?*

The object of that clause was not to grant power. It is a limitation of the State's power over contracts but in one particular. No binding contract can be interfered with. It is, that the obligation of a contract shall not be impaired. The word obligation is essentially involved in this consideration, that contracts may be touched, modified, impaired, but of such as creates an obligation that is not to be impaired.

Who is a party to this supposed contract? *Washington* county. What sort of a party is she? She is an agent merely to exercise certain conferred powers. Her wants are public. So of her objects. They co-exist with the county. The interference of the State in the local matters of her counties, are matters of history. 1650, chap. 8. 1695, chap. 13. 1773, chap. 10. 1748, chap. 15. 1789, chap. 29. Resolutions of

convention of 1776. 1832, chap. 312. 1826, chap. 148. At no period was the absolute power of the State to change the counties at her will and pleasure doubted. The charter of *W.* county might be annulled. Then this suit could not be maintained. Where is the limitation of this power?

What are its qualifications and exceptions? It is that they cannot interfere with the prior acquired property of the corporation. This is true in some respects, though it is only to be found in the opinions of *Judge Story.* 9 *Cranch,* 42.

In cases of mis-user and non-user, the Legislature may, under proper limitations, secure the property for the use of those for whom, and at whose expense it was originally purchased. This is all. The object of the use in such cases is local as for the county. 4 *Wheat.* 663, 644, 668, 694, 695. In 661 the doctrine is stated, and is conclusive of this case. 13 *Wendell,* 337. 1 *Breeze,* 315, 120. *Missouri Rep.* 238, 239. 2 *Peters,* 411. 3 *Peters,* 389. 4 *Peters,* 503. 8 *Peters,* 100.

JOHN SERGEANT in reply—

The county of *Washington* and the *Baltimore and Ohio Rail Road Company* are the parties in interest here. By the act of 1829, chap. 21, sec. 3, the commissioners of that county are made capable to sue, and hold all kinds of estate, property and effects. See also the 4th section.

I begin with the act of 1840, chap. 260, what is there remitted, is a penalty to the State.

By the act of 1837, chap. 314, sec. 4, the forfeiture of one million of dollars under the act of 1836, is "for the benefit of *Washington* county." Now this is not the penalty released by the act of 1840, so far as concerns that county.

By former Legislatures the construction of the *B. & O. R. Road* was deemed an injury to *W.* county, though beneficial to the State and *Baltimore,* and hence they provided this benefit for her. The million of dollars was introduced into the act of 1835, chap. 395, seriously, deliberately, designedly, by the Legislature and *Rail Road Company,* and is not to be treated lightly. It was plainly promised to us for protection.

We came in under that banner. The State gave us a right to her banner, and permission to use it. The nature of the question invests it with the greatest dignity. On one side, the champion is the *Rail Road Company*. We champion the rights of the citizen and of the Constitution of the *United States*. There are two great guaranties. One is political; the other is of civil rights. Judicial right spreads over all beings, whether corporate or individual. It is a protection from attainder, and *ex post facto* laws; and of the great moral rights which the citizen has independent of political regulations, by force of the law of contract. What is meant by contract? It is not defined. The law of contract is in the heart of man. He knows a promise is made. He knows he ought not to break it. What is the whole business of life, except political arrangement and crime, it is contract. It is all contract. To do or not do a particular thing as promised, is contract. There is no exception in the prohibition of the Constitution of the *United States*. We do not mean to make a moral exception in that instrument. The obligation of man to man is to be preserved. The provision in the Constitution of the *U. S.* is as extensive as contract, express or implied. In *Fletcher & Peck* was a case of implied contract. An implied contract not to resume a grant. What a singular oversight it would have been, if not so. The inhibition would have been nugatory. Implied contracts arise out of every transaction between human beings. Implied contracts to pay. So through the business of life, it is occupied with implied contracts. There is no exception either of thing or person. Whatever can make a contract is protected. Can any repudiate that instrument? The rule is universal as to the fruits of contract. If it sounds in penalty, the penalty as fruits, may be recovered in part or in the whole. It is no answer to the Constitution of the *United States* to say, that this sum claimed is penalty. Is it due by contract? This is the great guaranty in the Constitution. Valid contracts, and an independent judiciary, shed a mass of happiness. In a despotic government these are not tolerated. The safety is in an independent judiciary. It has

no power to annoy, it has hardly the power of self-defence. But it dispenses the duties and obligations of contract, and so enforces the Constitution.

Courts of justice are obliged to enforce the law. They have no choice. If entitled they will give the claim. If not a constitutional claim, or the law of doubtful application, it must be a *bona fide* doubt; not a doubt hunted up or searched after: none of that. The courts are to examine calmly and fairly. If a real doubt exists, the courts have nothing to do with the consequences. What consequences are more fearful than arbitrary power? Better, far, that all rail roads should be torn up—all canals destroyed—better that we should go back to our ancestors, than under color of good, we should do deliberate wrong. The argument for doing good from necessity has sometimes prevailed in all countries. It has established arbitrary power, armies, navies and conscripts, and spread ruin over many lands.

A Constitution is a blessing and protection to the rights of mankind. Let us not forget we have this blessing. Every deviation from it has a tendency to wrong. The courts must protect the clause which preserves contracts, liberally in favor of civil rights, not pair it down until nothing is left. It is for all the people, like the bounties of Providence for the good or evil—just or unjust—let no man intercept it. Give it a free course. Let it be appreciated by all. It is not a political regulation. It is far above any such. The right of appeal controls it. Suppose it may destroy a road? There are instruments of destruction not so intended, but built for good. It may be, that all other towns than *Baltimore* may be destroyed. Many incalculable losses may come. What then? is the road to be stopped. The question may come, who is to be drowned—you or I? Then comes the law of self-defence with its consequences.

The distinctions we contend for arise on the whole instrument. Security from crime may be provided for, but contracts are not to be impaired. Crime is left to the State without other exception. But contract is without her power, has no exception, else the State power had been unlimited. What sounds in

contract is also sacred. Contracts are to be fairly construed according to the intent of the parties; as what an act means, or is fairly understood to mean. Then here there is something to be released, an outstanding something. There is an evil tendency abroad in relation to contracts, against which a moral sanction ought to be applied. This is the moment when

"Ease would retract, vows made in pain,
Pain would retract, vows made in ease."

Repudiation is the ugliest word in our language. Even the power of Congress is not decided as to vested rights.

The Supreme Court has exclusive jurisdiction over constitutional questions. Therefore its authority is to give law on this subject. On local laws it defers to this Honorable Court. But as to the Constitution and Treaties, that court has the conservative power.

Does the act of 1840 impair the obligation of contract? If it does, it is void. Void to that extent, no further. It may be good in part and bad in part. If the act merely gives up State rights, it is valid. If it does what is imputed to it, it is void. The penalty spoken of in 1840 is not in the original law. It speaks of a penalty to the State, and not of one, for the use of the county.

By the settled rules of construction, unjust consequences are to be avoided if possible; and crime, by assent, by adoption, is a new idea.

The criminal power of a State is without control. It is plenary. What is its nature? It does not act by contract. It imposes *proprio vigore.* Crime does not exist by agreement to contract and be punished, but is compulsory. There can be no agreement to do a public wrong. This is void. Individual will makes a contract between individuals. Corporations must be alive to the law of the land and measure of justice. The character of the party is immaterial. The State may contract. So of the county and the company. The act of 1835 authorised *Washington* county to contract. It conferred on her the power to become a party to this contract. The

State and the rail road company put her there, and hence the act must be expounded most favorably to *Washington* county.

Whatever will make a contract with individuals, will also make one with corporations, being within the scope of their charter. The rules are the same as respects parties. Here are parties all competent to contract. The consent given under the act of 1835, was by all the corporators in the rail road. They were authorised to act by that law. The whole power of the corporation was exerted.

The first party in point of order was the State. She may contract within constitutional limits. She has as much power as any ordinary corporation. This power is not derived from the Constitution. It is a moral power. There is a distinct independent capacity to legislate and to contract. The power of legislation is in the people. It is given to a majority. It is an artificial power by a grant conferred. Nature does not grant the power of legislation. Power is sagacity, strength and wisdom. Hence ten men more powerful than ninety. We substitute an artificial for a natural rule where all are equal. The power to contract may lodge with the political power, as in the case of treaties, though not necessarily so. To contract is a moral power. Hence law may be altered, but contracts cannot be, but by the judgment of a court of competent jurisdiction or by agreement. The contract and the rights under it are the same. The forum to enforce is immaterial; where a third interest arises no two can dissolve, though they did create the obligation. It is admitted, the county may take and hold. Then as to the million, it is asked, what is to be done with it? The county was to have it by law—by the authority of the State, and with the consent of the company. Can the company then escape from its recovery? Such is the contract. You will not resume it. This is an inference of justice. What is to be done with the fruits of the suit, is a subsequent question, and we need not deal with it. That question was not considered when the law was passed.

The assignor of a bond cannot defeat his grant. A contract of A with B, for the use of C. What is the right? Where is

the equity? In C, who has the beneficial interest. There was a subject matter for a contract, and mutual equivalents. In a legal sense, an act of a Legislature may be, or may become a contract. Then when is an act a contract? When it is proposed by one, and accepted as proposed by the other. Then it is a contract, and does not rest on the criminal jurisprudence of the county to enforce its obligations. The breach is civil in its nature. The forfeiture is civil. To enforce it, a contract is counted upon. In a certain event the forfeiture accrues. The breach is non-payment. Debt and damages are recovered.

An act may operate *per se*, or by means of the acceptance of another party. Private charters are contracts. The Legislature may grant or refuse them. Why are they beyond the reach of the Legislature? Because they are contracts. They may be charters for public purposes, as for education, where the spread of a good thing is a good principle. 9 *G. & J.* 395.

Constitutional alterations in contracts are by agreement, consent, mutual agreement. One cannot be compelled to become a corporator. Hence a charter and its supplements are all contracts. This act is in form a contract. What is the import of the paper deposited with the State? It is the bond of the company to fulfil the act of 1835, and all its stipulations. This is contract, and it is so by universal law. Correspondence to and fro in commerce makes contract. This necessity exists every where by implication. The most important contracts are made by assent, and though not in language, yet by assent. The secret power behind which a party shelters himself, and thus becomes false to his pledge, we call by bad names. He who alleges that he has a reserved, undisclosed equity, fails in a court of justice. No such reservation is permitted. The acceptance is co-extensive with the offer. Each provision becomes matter of contract. They have sealed this with their corporate seal. No power exists to alter it, and you will award it to us without the act of 1840. Two parties have undertaken to alter the contract. The third was absent. The absent has been presumed to be in the wrong. Suppose a donor was to transfer property to himself for the use of his child.

This is perfected, and Chancery would uphold it.   So here. All is done that was required to be done under the act of 1835. A million for *Washington* county, not for the State, nor for her use.   The act is conclusive evidence that it could not be passed without this provision.   In substance, a contract in which what is done, could not be done by the Legislature, except through the medium of contract.   It could not have so bound the company.   Assent gives it all its efficiency.

The act of 1840 is an *ex post facto* law, and void.

The duty under the act of 1835 is a prescribed duty, with a license on terms to take another direction.   The injury is to *Washington* county, so is the act.   Compensation should be made then.   There is nothing new in this.   It is a legal and appreciable consideration.

If the act does not mean this, what does it mean? I propose to give it a serious construction and its true signification.   It is said to be all for the State.   That the county is a creature of the State.   Then why not so said?   It is said the reserved power of the State does the act complained of.   It is not reserved in the act.   None of the acts so declare, but on the contrary.   Justice cannot remove this away by force; power may.   If the State can release the sum, then how for the benefit of *Washington* county?   She is sure of being taxed.   Sure of damages from a different construction of the road.   But is that what was meant?   The plain import of the words, for the use, cannot be broken down.   The argument which destroys this law is repudiation.   It escapes the plain justice of the law. Once go wrong, and there is no end of the error.   As respects the State this is not a judicial question, but a political one, and of a fluctuating character.   We hold on to the impartial administration of justice.

The terms of the law are to be construed according to their appropriate and legal sense.   It is contrary to all rules to imply what is fatal to the contract.   You may imply all that is essential to give it effect.   So in an executory contract.   An inconsistent proviso in the body of an act is void.   Those terms had a settled, legal meaning.   All so understood them.   The

company may not now urge any other construction. The contract is not less valid because under seal. Its object is to maintain the truth of the case. The State has none of the properties of a trustee—none of his rights. Has no controling power. Is only a *quasi* trustee. She is merely to facilitate a recovery. This is the whole trust. It is like the use of real estate in trusts of modern creation. The trustee is not to interpose any hindrance. By assignment of a chose in action, you may use the assignor's name, and the law will protect you. The right to the beneficial interest gives the right to use the name.

The person named in a contract is the party to it. The State is bound to make a special act for the use of the money. So of infants and *femes covert*. A deposit made for the benefit of the latter, with the concurrence of her husband, can he take her property from her? The disability of coverture removed, she will take it. Suppose *Washington* county cannot use it. Still it is hers, and this does not affect the right.

Before the act of 1840, how would the State have counted upon a breach of contract? Not in criminal penalty. The State could not prevent the recovery of the money. If the State cannot recover now, what hinders it but the act of 1840. If it hinders, it impairs the obligation of contract. There is no other bar. Then that act is void. The argument terminates here, unless the Legislature may extinguish or destroy the contract. Then the Constitution must give way, and be open to a new interpretation.

It is a hard bargain to fulfil on their part, now they have got all they wanted. The hardness of a bargain does not repeal the contract, a civil contract. Judgment is not a contract. It is *in invitum*. It is not a case between public and private charters. It is not a case of chartered rights. A public corporation may contract, may have property in possession and in action, may be plundered of its rights, and if so with impunity, not secure in its purchases.

It is said the county was created by the State, and therefore it follows, that its contracts may be violated. This I call a

*non-sequitur.* Its contracts are like other contracts while it exists, and none can say the contracts are void. 9 *Cranch,* 994. 16 *Mass.* 84.

If the charter be altered or taken away, does the county lose its property? What follows? It is not to be presumed the Legislature will so act.

Where a trust is formed and a *c. q. t.,* the law will furnish trustees.

What is granted for the use of a county is for the corporators, its inhabitants. Here the proposition is to take the grant from them and give it to the rail road company.

The power of Congress over penal statutes bears no resemblance to it. The repeal of a criminal statute discharges the penalty, because it arises upon, from the statute. These are not questions of contract.

The State may set aside crimes, has a power over remedies, but cannot touch a contract. To destroy all remedy where a debt subsists, is wrong.

This is a release of a debt and a dismissal of a suit. The government of the *United States* may impair the legal contract, but it leaves the equitable one. So it is not destroyed as long as the equity remains in force.

STEPHEN, J., delivered the opinion of this court.

This is an action of debt, instituted in the name of the *State of Maryland,* for the use of *Washington* county, to recover the sum of one million of dollars, claimed by the county from the *Baltimore and Ohio Rail Road Company,* for an alleged violation of contract contained in one of the provisions of its charter.

In bar of any recovery in this suit, the appellee has pleaded, that nothing is due to the county; and also, the act of Assembly annulling the obligation and releasing the forfeiture, in virtue of which the said sum of money is alleged to be due.

The controversy between the parties is one of considerable magnitude, not only as regards the sum involved in the litigation, but on account of the aspect it has assumed, as a ques-

tion involving grave considerations of constitutional law. The case has been argued with great legal learning and ability by the distinguished counsel employed to advocate the cause of the respective parties, and the court have derived no small degree of assistance in coming to the result at which they have arrived, from the light which has been shed upon the subject in the course of the discussion.

On the part of the appellant, it has been treated in the course of the argument as a clear case of contract, covered by a constitutional sanction, and therefore inviolable by legislative interference; on that of the appellee, it has with a confidence seemingly and no doubt really, equally sincere, been treated as a clear case of penalty, and therefore subject to legislative control, and free from constitutional difficulty.

We have considered with that care and attention which the importance of the subject demanded, the arguments which have been urged on both sides of the question, and have come to the conclusion that, according to the true construction of the act of the Legislature from which the controversy has arisen, it is not a case of contract, the obligation of which has been impaired by legislative interference, but a case of penalty, and therefore subject, as to its enforcement, to the will and pleasure of the Legislature. It is a rule in the exposition of statutes, that the will of the Legislature is to be regarded, and to be carried into effect, so far as they keep within the limits prescribed to them by the Constitution or fundamental law, and in ascertaining such will or intention, the well established rule is, that "if divers statutes relate to the same thing, they ought to be all taken into consideration in construing any one of them." For this principle, see 6 *Bacon's Abr.* 382. And so far has this rule been carried, that it is held to apply, although one of them may have expired. For which doctrine, see also the same book, 383, where it is said—"it is a rule in the construction of statutes, that all which relate to the same subject, notwithstanding some of them may be expired, or are not referred to, must be taken to be one system, and construed consistently." Adopting this rule in the case now before this court, as a legi-

timate test or standard by which to indicate the legislative mind, we think the inference will be found to be well warranted, that the duty imposed upon the appellee of locating the road through *Cumberland, Hagerstown* and *Boonsborough,* was intended to be enforced, not by the obligation of contract, but by the sanction of penalty alone. The language of the 5th section of the act of 1835, chap. 395, is as follows : "and it is hereby declared to be and made the duty of the said company to, and they shall so locate and contruct the said road, as to pass through each of the said places ;" *"Provided,* that if the said *Baltimore and Ohio Rail Road Company* shall not locate the said road in the manner provided for in this act, then and in that case they shall forfeit one million of dollars to the *State of Maryland,* for the use of *Washington* county." It is another well settled rule in the construction of a statute, that "the words are to be taken in their natural and ordinary signification and import, and if technical words are used, they are to be taken in a technical sense." 1 *Kent's Com.* 462.

Applying these principles of interpretation to the case before us, and we think the conclusion is well warranted, that penalty and not contract was in the contemplation of the Legislature when they enacted the fifth section of the act of 1835, upon which this suit has been instituted, in case of non-compliance with the requirements of the law, the company is to forfeit one million of dollars to the *State,* for the use of *Washington* county. The term forfeit, in common parlance, strongly implies penalty, and such appears to be the import ascribed to it by lexicographers of the highest respectability, in giving with precision and accuracy, the meaning of our language. *Mr. Webster* defines the word forfeit to be that which is forfeited or lost by neglect of duty, or in other words, a fine, a mulct, a penalty. The language, moreover, is not that of convention or contract, but is mandatory in its character. It is the language of the creator to the creature, enjoining a duty to be performed, and imposing a penalty or forfeiture for disobedience or neglect. It is therefore, we think, in every view and aspect under which it could be considered, penal and not con-

ventional, according to its sound and true interpretation. In this sense it appears to have been understood by the Legislature when they passed the act of 1840, chap. 260. In that act they say, "that so much of the 5th section of the act of 1835 as makes it the duty of the *Baltimore and Ohio Rail Road Company* to construct the said road so as to pass through *Hagerstown* and *Boonsborough*, be and the same is hereby repealed; and that the forfeiture of one million of dollars reserved to the *State of Maryland* as a penalty, in case the said *Baltimore and Ohio Rail Road Company* shall not locate the said road in the manner provided for in that act, be and the same is hereby remitted and released; and any suit instituted to recover the same sum of one million of dollars, or any part thereof, be and the same is hereby declared to be discontinued and of no effect." In this law, the forfeiture to the *State* is emphatically termed a penalty, imposed for not locating the road as prescribed by the act of 1835, and although the right of expounding laws belongs to a different department of the government, and is not embraced within the sphere of the legislative power, still the sense of the Legislature upon the subject of laws enacted by themselves, when of doubtful import, is a circumstance not, we think, entirely to be disregarded. In speaking of the rule that several acts in *pari materia*, and relating to the same subject, are to be taken together and construed as one system, *Chancellor Kent* says—"the object of the rule is to ascertain and carry into effect the intention; and it is to be inferred, that a code of statutes relating to one subject, was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions." See 1 *Kent's Com.* 463, 464. Much stress was laid in the course of the argument upon the first section of the act of 1835, which requires the assent of the company to the provisions of that law, as indicating that the fifth section should be construed to operate as contract, and not as penalty. The term assent, mentioned in that section, it was said, is a word peculiarly appropriate to contract, and not to penalty or forfeiture. This is certainly true as a general proposition, and need not be con-

troverted to elude or avoid the force of the argument upon the present occasion. The assent of the company was essential to give to the law a binding and obligatory force; the principle being well settled, that an act or charter of incorporation is nothing more than an offer until consummated by acceptance, and in that sense and for that purpose it was manifestly used in the first section of the act. It was assented to in that sense alone which it ought to receive, according to its sound and genuine interpretation; and to give to the term a different import, would be a perversion of the purpose for which it was adopted. As a further proof that the *fifth* section ought to be construed as creating a penalty and not contract, it may be useful to refer to the ninth section of the same act, where the language of contract is clearly and unequivocally adopted. The terms there used are peculiarly appropriate for that purpose, and are so expressive or significative of that intent, as to leave not a shadow of doubt upon the subject. The expression there used, "stipulate, agree and bind the said company," speak a language too explicit to be misunderstood, and remove every shadow of doubt as to the intent. Now is this the only instance in which the Legislature have spoken an unequivocal language, when they intended to bind the company by the solemnities or obligation of contract. In the third section of the act of 1827, chap. 104, expressions of similar import, are carefully used to create the obligations of contract instead of penalty; and that too in relation to the same subject, as the one embraced by the fifth section of the act of 1835, out of which this controversy has arisen, and if it was designed to deal with the company in the same manner, and to impose upon them the same duties and obligations, to be fulfilled under a similar responsibility in the 5th section of the act of 1835, it is difficult to conceive, why the appropriate language to execute that intent was abandoned, and terms of more equivocal import adopted. In the *third* section above refered to, after specifying certain conditions, upon the performance of which, the Treasurer should be authorised to subscribe on behalf of the State, the Legislature insert the following proviso:

OF MARYLAND. 435

The State, use of W. County, *vs.* B. and O. R. R. Company.—1842.

"And provided also, that the President and Directors of the said company shall agree so to locate said road, that it shall go to, or strike the *Potomac* river at some point between the mouth of the *Monocacy* river and the town of *Cumberland*, in *Allegany* county, and that it shall go into *Frederick*, *Washington* and *Allegany* counties; and provided also, before such subscription is made, the President and Directors of the said company shall, in writing to be approved by the Attorney General, bind the said company to allow the State to subscribe for the remaining five thousand shares on the same terms, at any time during the session of the next General Assembly." Here it is not made the duty of the company to locate the road in a particular direction, under a forfeiture for non-performance or neglect, as in the 5th section of the act of 1835; but in the language of contract, they are made to agree so to locate it, that it shall go into *Frederick*, *Washington* and *Allegany* counties, and in reference to the State's right of future subscription, it is still more apparent with what anxious solicitude the solemnities and binding efficacy of contract are preserved in the same section; upon that subject, the company was to be bound by a written instrument, which was not to be deemed satisfactory until it had received the sanction of the law officer of the State. It is moreover to be observed, that when at a subsequent period, it was found necessary, in consequence of a conflict of route with the canal company, to release conditionally the rail road company from their contract, as entered into by the act of 1827, the law by which they were discharged, holds the same language, and speaks of it as a condition or agreement from which they were released.

If then, the duty imposed by the 5th section of the act of 1835, was intended to be enforced by penalty, and not by contract, the next question to be considered is, were the Legislature competent to release the penalty in the manner they have done, by the act of 1840, chap. 260? In the exercise of such a jurisdiction, the Legislature are restained by no constitutional prohibition. The releasing act could not be deemed an *ex post facto* law in the sense of the Constitution, nor could it be

considered as impairing the obligation of a contract; indeed it was not attempted to be impugned upon either of these grounds in the course of the argument, but was exclusively assailed upon the ground that the act of 1835 provided for a case of contract, and not penalty; and that therefore, the act of 1840 was a violation of the constitutional inhibition, forbidding the State Legislatures from passing any law impairing the obligation of contracts. The money being forfeited to the State as a penalty for the use of *Washington* county, one of the constituent elements of the State, the Legislature had an unquestionable right to remit it. *Washington* county is an integral part of the State, or portion of the body politic, and the money, if received by her, would belong to her as public property in her public political capacity, to be applied exclusively to the public use. As a county, she stands to the State in the relation of a child to a parent, subject in all respects to its jurisdiction and power, as well as entitled to the benefits of its fostering care and protection. As a member of the political family, she has a right to participate in the legislative councils of the country; but the will of the majority, when expressed, according to the forms of the constitution, is binding and obligatory upon her, and to that will, as the rule of her conduct, she is bound to submit with becoming deference and respect. Several instances were referred to in the course of the argument, where it appears that a similar jurisdiction has been exercised by some of our sister States, but it is deemed unnecessary more particularly to refer to them. If then the act of 1840, releasing the penalty, was a legitimate exercise of power, and it was within the constitutional competency of the Legislature to pass it, what was the effect of that law upon the rights of the plaintiff, as to the further prosecution of her suit, and did it operate to bar the recovery of the penalty which was remitted by it? Upon that part of the case we think no doubt can be entertained, as all the authorities referred to seem to speak one uniform language upon the subject; they all agree that no penalty incurred during the continuance of a law, can be enforced after its expiration or repeal, without a saving clause or some

special provision to that effect. In 1 *Kent's Com.* 465, the principle is stated to be that, "if an act be penal and temporary by the terms or nature of it, the party offending must be prosecuted and punished before the act expires, or be repealed. Though the offence be committed before the expiration of the act, the party cannot be punished after it has expired, unless a particular provision be made by law for the purpose." To the same effect see 5 *Cranch*, 283, where *Chief Justice Marshall*, in delivering the opinion of the court says—"The court is, therefore, of opinion, that this cause is to be considered as if no sentence had been pronounced; and if no sentence had been pronounced, it has been long settled on general principles, that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute." Many other authorities might be referred to in support of the same principle, but the rule seems to be so well settled, that it is deemed unnecessary to do so. If this, therefore, is to be deemed a case of penalty, and not one of contract, the act of 1840 seems to operate as a complete bar to the plaintiff's recovery, and the judgment of the court below ought to be affirmed.

But supposing that the views heretofore expressed upon the merits of this controversy are not well founded, and that it is to be deemed a case of contract and not penalty; is it a contract coming within the purview of the Constitution of the *United States*, which prohibits a State from passing any law impairing the obligation of contracts, and was the act of 1840 therefore a nullity? In order to arrive at a just conclusion upon that subject, it is material to consider who are the contracting parties, and in what relation does the *cestui que use* stand to the legal plaintiff upon the record? The contracting parties are the State on the one part, and the rail road company on the other. The consideration of the contract were the franchises and privileges derived by the company from the State, and the *cestui que use* is one of the counties of the State, claiming an interest incidentally in her political character and capa-

city, in virtue of one of the provisions contained in that contract? The State, for reasons which she deemed sufficient, has thought proper, by an act of her Legislature, to annul the contract and release the claim of the *cestui que use*, which this action has been instituted to enforce; and it is now contended on the part of the appellant in support of it, that such legislative act is a nullity, because it violates that great moral sanction of the Constitution, which declares, that no State shall pass any law which impairs the obligation of contracts. To declare an act of a co-ordinate department of the government an unwarrantable assumption or usurpation of power, because it is a violation of a constitutional prohibition, is an exercise of the judicial office, of a grave and delicate nature, which never can be warranted but in a clear case; but however painful and unpleasant the task may be, it is a duty enjoined upon the courts of justice sometimes to execute it, under the solemn sanctions of an oath, which they are not at liberty to overlook or disregard. In the case, however, which we now have to decide, we have no such duty to perform, because we think the Legislature have not transcended their constitutional limits in passing the act of 1840, by which they released the claim of the plaintiff, and discontinued the action which was brought to enforce it. *Washington* county, by which the claim is attempted to be enforced, is one of the public territorial divisions of the State, established for public political purposes, connected with the administration of the government. In that character she would receive the money as public property, to be used for public purposes only, and not for the use of her citizens in their private individual characters and capacities. In that relation they would have no immediate interest, and could assert no title. She is one of the instruments of the government, invested with a local jurisdiction to aid in the administration of public affairs, and may be emphatically termed a part of the State itself. If then it be public, and not private property, it would seem to be completely at the disposal of the government, and the act of 1840 was nothing more than a rightful exercise of legislative power. In the forty-fourth num-

ber of the *Federalist*, a work of distinguished merit and ability, written principally by two eminent members of that convention of enlightened men, by whom the Constitution of the *United States* was formed, *Mr. Madison*, speaking of that principle contained in it, which prohibits the States from passing any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, uses the following language as indicating his understanding of the views of the convention when they adopted that prohibitory clause of the Constitution—"The two former are expressly prohibited by the declarations prefixed to some of the State Constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional defences against these dangers ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favor of personal security and private rights." In 2 *Dallas*, 320, *Judge Patterson*, who was also a member of the convention by which the Constitution was formed, speaking of the import of the same constitutional restriction upon State legislative power, expresses himself in the following terms: "Over public property they have a disposing and controling power, over private property they have none, except perhaps in certain cases, and those under restrictions; and except also what may arise from the enactment and operation of general laws respecting property, which will affect themselves as well as their constituents." In 2 *Kent's Com.* 275, *Chancellor Kent* says: "Public corporations are such as are created by the government for political purposes, as counties, cities, towns and villages, and the whole interest in them belongs to the public." In the *Dartmouth College* case, the Chief Justice, in delivering the opinion of the court, observed, that the provision in the Constitution never had been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. *Dartmouth College* was a private eleemosynary institution, endowed with a capacity to take property for objects unconnected with the government, and its funds

were bestowed by individuals on the faith of the charter, and those funds consisted entirely of private donations. The corporation was not invested with any portion of political power, nor did it partake in any degree, in the administration of civil government. A contract of that kind he held to be within the purview and protection of the Constitution. In 9 *Cranch*, 52, *Mr. Justice Story*, in delivering the opinion of the court, says: "In respect also to public corporations, which exist only for public purposes, such as counties, towns, cities, &c., the Legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, securing, however, the property for the use, of those, for whom, and at whose expense, it was orginally purchased." In 9 *Gill & John. Rep.*, 401, this court express themselves to the same effect, where they say: "Public corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to inspect, regulate, control and direct the corporation, its funds and franchises. That is of the essence of a public corporation." Again, in page 397 of the same book, it is said: "A public corporation is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of civil government; an instrument of the government, subject to the control of the Legislature, and its members, and officers of the government for the administration or discharge of public duties, as in the cases of cities, towns, &c."

In 1804, the justices of the levy courts of the respective counties were incorporated, and all property belonging to any county, or appropriated to any county use or purpose, was vested in them for the benefit of the county; and by an act passed in 1829, chap. 21, commissioners are directed to be chosen biennially by the voters of the county of *Washington*, who are likewise incorporated, and in whom the same powers and privileges are vested, as were given to the justices of the levy courts by the act of 1804, and all property belonging to the county or appropriated to its use, is in like manner vested in

the said commissioners. The money then for which this suit has been brought, if recovered, would be vested in this body coporate, as a public corporation, for public or county purposes, and would not be private property, belonging to the citizens of the county in their individual rights or private capacities. It would be held by the commissioners as public property given by the State, to be used only under legislative authority, for public purposes, and be subject in their hands, in all respects whatsoever, to the controling power and jurisdiction of the Legislature.

It is a circumstance moreover worthy of consideration, as indicating the public character of these commissioners, and the official relation in which they stand to the government as public agents, that the act of incorporation provides, that in case of death, resignation, refusal to act, or removal from the county, the vacancy so occasioned, shall be filled by the Executive of the State, until a new election shall take place.

To put the question in a still stronger light, let it be supposed for the sake of the argument, that the one million of dollars had been appropriated as a forfeiture to the use of the *Eastern Shore* of *Maryland*, one of the two great divisions of the State, could it be contended with any semblance of reason or propriety, that a remission of the penalty by the State would not be a legitimate exercise of legislative power? Or to put the question in a still clearer point of view, suppose the money had been appropriated to the use and benefit of all the counties of the State, designating each of them by their respective names, (which would be substantially to the use of the State,) could it be successfully maintained, that the government, if the public good required it, would have no right to remit the forfeiture? And if it could be lawfully done, where the interests of all would be involved, upon what principle of sound reasoning could it be urged, that the same power and jurisdiction would not exist, where the rights of one alone would be concerned? If the interest of *Washington* county could be merged in the public good in *association* with her sister counties, without a violation of constitutional law, where

reasons of State policy required the sacrifice to be made upon the altar of the general welfare, it is difficult to conceive upon what ground of fair reasoning a similar power could be denied to exist, where her interest alone, in her separate capacity, should be offered up as a victim, to attain the same object. A jurisdiction which would be rightfully exercised in the one case, could not be wrongfully exerted in the other.

Under every view, therefore, which we have been able to take of this case, we think that the claim of the appellants is wholly groundless and untenable, and that the judgment of the court below ought to be affirmed.

JUDGMENT AFFIRMED.