(Decided June 3rd 1864.)

MARTHA HARRISON, GEORGE HARRISON AND OTHERS *vs.* THE STATE OF MARYLAND, AT THE INSTANCE AND FOR THE USE OF COLUMBUS HARRISON.

ACT OF 1777, CH. 12. ACT OF 1860, CH. 271. MARRIAGE WITHIN THE PRO-HIBITED DEGREES.—The Act of 1777, ch. 12, sec. 1, enacts "That if any person within this State shall hereafter marry with any person related within any of the degrees of kindred or affinity expressed in the following table such marriage shall be void;"—the relation of uncle and niece being included in said table.

Section 2. Provides a punishment for the offence.

Section 6. Provides the same punishment and penalty in case of a person going out of the State and there marrying a person of this State contrary to the Act.

Section 14. Enacts "That the General Court may inquire into, hear and determine either on indictment or petition of either of the parties the validity of any marriage, and may declare any marriage contrary to the table in this Act, or any second marriage, the first subsisting, null and void; and on appeal the depositions and evidence given in the cause shall be transmitted with the record to the Court of Appeals, and thereupon such cause shall be heard, determined and adjudged *de novo.*"

The Act of 1860, ch. 271, (Code, Art. 60, sec. 3.) Enacts "That all marriages heretofore made or celebrated in or out of this State by, and between per-

sons related within the following degrees of affinity, to wit: a man and his niece, or a woman and her nephew, be, and the same are hereby confirmed and made valid to every intent and purpose, from the time of the celebration of such marriages respectively," &c.—Held:

1st. That under the first of these Acts, a marriage celebrated in the year 1851 in the District of Columbia, between a man and his niece, was not *ipso facto* void, but only voidable upon judgment or decree for that purpose found or passed during the lifetime of the parties.

2nd. That the Act of 1860, ch. 271, was a lawful exercise of power on the part of the Legislature, being neither extraordinary, unconstitutional nor unjust, but conservative, essential and salutary, being the only adequate means of healing or preventing inevitable wrongs, public and private.

Interpretation of Acts and Statutes.—Cotemporaneous legislation is the best standard of the meaning of laws

————: Void and voidable Marriages.—When a marriage is declared to be void, it does not necessarily mean *void ab initio*. Reason and justice would imply it to be void from the time its nullity should be pronounced by a Court of competent jurisdiction, not that it should be so construed whenever brought incidentally in question.

The Act of 1777, ch. 12—Construction of.—The Act of 1777, ch. 12, being penal in its character, must be taken strictly "in the point of defining and setting down the fact and the punishment."

Constitutional Law.—A Legislative Act should not be pronounced unconstitutional or invalid in a doubtful case where the doubt is *bona fide* and well founded. Declaring an Act unconstitutional is the exercise of a judicial power of a grave and delicate nature which can only be warranted in a clear case.

A cotemporaneous construction of the Constitution, of long duration, continually practiced under, and through which many rights have been acquired, ought not to be shaken but upon the ground of manifest error and cogent necessity.

The right to confirm is the necessary corollary of a power to dissolve marriage by divorce. The consequence of which is—incidentally—authority to determine the *status* of the issue of the marriage.

Appeal from the Circuit Court for Calvert County.

This was an action of debt on an administration bond instituted on the 24th of September 1859, by the appellee against the appellants.

The record shows that Robert Harrison of Robert, who, in the year 1851, resided in Calvert County, in this State, was, in the month of December in that year, married, in

Washington City, in the District of Columbia, to his niece, Martha Harrison, at that time also a resident of Maryland. Returning to Calvert County, the parties cohabited as man and wife for several years, until the year 1858, when Robert Harrison died, leaving children by said cohabitation. The equitable plaintiff is a nephew of the deceased, and claims in this action a distributive share of his estate, to the exclusion of the children of the deceased by said marriage, on the ground that the marriage was a nullity under the laws of Maryland.

The Court below (BREWER, J.,) granted an instruction to the jury the effect of which was to declare the marriage absolutely void, and from this action of the Court the present appeal was taken.

This cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, and COCHRAN, J.

*R. J. Brent* and *O. Miller*, for appellants.

*1st Point.*—The construction of the Act of 1777, ch. 12.

The great inquiry is, whether the legislature meant to avoid these marriages *ab initio*, and to all intents and purposes, or only to declare them void by the judicial proceedings authorized by the 15th section of that Act. The common law did not suffer marriages within the prohibited degrees, or any incestuous marriage to be avoided after the death of either party, because such action would bastardize the innocent offspring. 2 *Kent Com.*, 96. *Elliott vs. Sugden*, 2 *Phil. Rep.*, 16. 1 *Tucker's Bl. Com.*, 434. 2 *Pars. on Cont.*, 108. 1 *Rolle's Abr.*, 357, *L.*, 42–45. Such a statute is said by Dr. Lushington to be a penal law, and as such must be strictly construed. *Bishop on Marriage, sec.* 170. 1 *Robertson's Eccles. R.*, 321. *Queen vs. Wye*, 7 *Adol. and Ell.*, 761; (34 *Eng. C. L. Rep.*, 215.) 3 *Nev. & Per.*, 13.

2 *Stark. Ev.*, 221. *Carthew R.*, 271. 2 *Salk.*, 548. 4 *Mod. R.*, 18. 12 *Mod. R.*, 35. *Corrie's Case*, 2 *Bl. Ch. R.*, 488. In construing this statute, it should, as far as possible, be made to harmonize with the reason and principles of the common law. *Dwarris on Statutes*, (9 *Law Lib.*,) 695.

Undoubtedly, if we looked only to the 1st section, and there was nothing to soften its rigors, the marriage would be made null by legislation; but as the construction must be on all the sections "*ex visceribus actus*," and the rule is, that the best interpretation is to be had "*ex antecedentibus et consequentibus*," (see *Dwarris on Statutes*, 699, and *Pennington vs. Coxe*, 2 *Cranch*, 33–52,) we confidently maintain that the statute while avoiding the marriage, provides a specific mode through the judiciary, of declaring it void.

It is not enough to say the marriage is void, unless you ascertain when and how it is to be avoided, *qui hæret in litera hæret in cortice*. *Hobart's Rep.*, 166.

Nor is it any objection to this construction, to say that the same power is given by the 15th section to determine the validity of "any second marriage, the first subsisting." Because, all such second marriages being void at common law, as shown in 2 *Com. Dig.*, "*Baron and Feme*," the simple provision that either party may obtain a sentence of nullity from the General Court on that ground, would not alter the common law as to the original nullity of such acts of bigamy.

Besides, in cases of bigamy, there could not in the nature of things be a husband with two legal wives in a country where polygamy was not allowed. Such reasoning against our interpretation of this 15th section, is therefore more specious than solid.

Nor do we think that the reference in that section to indictment helps the adverse construction, as it is only meant that the validity of such marriages may be deter-

mined on indictment by the State, or by petition of either party, thus enabling the public to have such marriages investigated and annulled, as well as the parties themselves. The nullity of the marriage is therefore not left dependant solely on the election of either party, but can be declared on public indictment.

In 1753, the English Parliament made all marriages contrary to the Marriage Act void "to all intents and purposes," and provided no tribunal to adjudicate specially on the validity of the marriage. 7 *Stat. at large, p.* 526. *sec.* 8. The Legislature of Maryland, in 1777, twenty-four years afterwards, while annulling the marriage, provides a special tribunal to pronounce it void—such a departure from the Marriage Act of England, was doubtless to qualify the rigors of its sweeping prohibitions, and not leave such an important matter as the nullity of these marriages to the uncertain and contradictory verdicts of juries in the various forms in which these marriages might be involved.

It is always a question of construction whether the statute intended to avoid the marriage *ipso facto* without further proceedings. *Bishop on Marriage, sec.* 46, 47. But it is supposed that the penalties imposed in this statute, make the marriage void under the common law rule, that contracts made unlawful by penalties are necessarily void. This rule does not apply to penalties incurred under Marriage Acts. *Bishop on Marriage, sec.* 167, 8, 9; *sec.* 170, 1, 2. *Parton vs. Hervey,* 1 *Gray's Rep.,* 120. Nor does this Act profess to avoid any marriage made out of the State, but punishes the act of leaving the State, and marrying without it personally. It is not like the Royal Marriage Act referred to in *Sussex Peerage Case,* 11 *Clark & Finnelly, p.* 146. The validity of marriages is to be tested by the "*lex loci contractus,*" and it is no answer to suppose the extreme case of a Mormon importing here his army of wives. *Story's Con-*

*flict of Laws, sec.* 103. *Ib., sec.* 123. 2 *Parsons on Cont.,* p. 109. *Poynter on Marriage,* (13 *Law Lib.,*) 55.

Finally, we insist that if the General Court had on petition or indictment declared this marriage valid, it would have concluded all the world as a decree *in rem,* and so if it had declared it a nullity. This therefore proves that the marriage is only voidable by the Court. If, therefore, there be a doubt on the whole law, the Court will uphold the marriage, though prohibited by the statute. *Catteral vs. Sweetman,* 1 *Roberts Eccl. R.,* 312–314, 315, 321. *Bishop on Marriage, sec.* 170.

*2nd Point.* That the Act of 1777, ch. 12, was not at the date of this marriage capable of being carried out or enforced (*quoad* the 15th section) in the District of Columbia, and therefore the first section could not be considered in force, because, by that Act, the marriage, though declared void, could only be avoided by establishing the fact of the prohibited degree of consanguinity in the General Court. See 15th section. And the Act of Congress, of 27th February 1801, only gave the Courts of the District of Columbia the same powers as Circuit Courts of the United States, and not the powers of the General Court of Maryland. 2 *Stat. at Large,* 105, *sec.* 3. And such was the decision of the Supreme Court, in several cases. *Kendall vs. United States,* 12 *Peters,* 524. *Decatur vs. Paulding,* 14 *Peters,* 497. It is true, the Act of Congress, passed 27th February 1801, adopts generally all such laws of Maryland as were then in force in Washington County. See its 1st section. 2 *Stat. at Large,* 105. But the Supreme Court have held that this general adoption is to be qualified to apply to such laws as were compatible with the change of Government, that is, as could be executed. *United States vs. Simms,* 1 *Cranch,* 252.

*3rd Question.* If the marriage in question is to be deemed null and void to all intents and purposes when contracted; is it not cured for all purposes by the heal-

ing virtues of the subsequent Act of the Legislature, 1860, ch. 271?

Acts of legislation are never set aside as unconstitutional in doubtful cases. *State vs. B. & O. R. R. Co.*, 12 *G. & J.*, 400. *Cromwell vs. State*, 12 *G. & J.*, 257. *Mayor & C. C. of Baltimore vs. State, &c.*, 15 *Md. Rep.*, 453, 475, 476.

It must be conceded by our adversaries that this marriage violated no principle of natural law, and was valid at common law. There being good reasons of policy against all marriages between parties nearly related to each other, the statute law of 1777, prohibited them as a matter of policy. But for the statute, being good marriages, the question is whether, if the policy of the State is reversed, and such marriages declared valid *ex post facto*, there is any wrong done to a distributee claiming against the marriage thus legalized by a change of legislative policy?

We shall demonstrate that these confirming Acts have been so long in vogue, both in England and in our own State, and have been so uniformly recognized and upheld by the Courts under all the objections now urged to this Act, that it would be a bold and rash judicial act that would at this late day annul such confirmatory legislation. No argument in favor of the sacredness of vested rights can be listened to when it assails the long established muniments of legislative and judicial precedents for the last century. In 1753, (as we have shown before,) the English Parliament annulled all marriages not made in strict confirmity to the requirements of the statute of 26 *George* 2, *ch.* 33, 7 *Stat. at Large, p.* 526, *sec.* 8. In after years that Parliament, seeing how many families would be illegitimated, passed several curing Acts confirming all marriages therein recited. See 21 *George* 3, *ch.* 53. 44 *George* 3, *ch.* 77. 48 *George* 3, *ch.* 127.

The first of these healing Acts was passed in consequence of the decision of the Courts, and to prevent the disastrous consequences of that decision. *King vs. Northfield, Douglass Rep.*, 659. It will be seen that these confirming Acts contain no saving in favor of what are now called vested rights, but the marriages originally void are cured and made valid absolutely and for all purposes. Although in a lapse of so many years, many of the parties must have died, and legal rights have vested by descent or distribution upon the basis of the nullity of those marriages as judicially pronounced, yet the English Parliament made no saving, but swept away these cobweb ideas of vested rights in heirs or distributees. They saw no distinction between confirming void marriages as against the parties themselves, and confirming them, as against their heirs and distributees.

Our Legislature, in 1785, (eight years after the Act of 1777,) and in 1790, (thirteen years after the Act of 1777,) followed the example set by the English Parliament, and confirmed retroactively certain classes of the marriages prohibited by the Act of 1777, ch. 12. See 1785, ch. 35. See 1790, ch. 20. These precedents are legislative expositions of the Bill of Rights and Constitution of Maryland, and being almost cotemporaneous with those instruments, they come up to the standard of the legal maxim, *"cotemporanea expositio est optima."* *Stuart vs. Laird*, 1 *Cranch*, 299. *State vs. Mayhew*, 2 *Gill*, 497. *Bradford vs. Jones*, 1 *Md. Rep.*, 369.

No State in this Union has gone further than Maryland, to confirm, by the legislative power, acts which were void, when performed; and no Judiciary has gone further than our Judiciary, to uphold those acts whenever assailed as subversive of vested rights, as remarked by Judge MARTIN, in delivering the opinion of the Court in *Baugher et al. vs. Nelson*, 9 *Gill*, 306. In this case Judge

MARTIN also declares, "that vested rights are those which a party may insist on without violating any principle of sound morality—there can be no vested right to do wrong." See also upon this point, *Satterlee vs. Matthewson*, 2 *Harr.*, 50. *Del. Digest*, 400. *Goshen vs. Stonington*, 4 *Conn.*, 209, 221. 1 *Kent's Com.*, 503. *Satterlee vs. Matthewson*, 2 *Peters*, 413. Same case, 16 *Serg. & Rawle*, 169. *Hess vs. Werts*, 4 *Serg. & Rawle*, 356. *Starr vs. Pease*, 8 *Conn.*, 505. *Savings Bank vs. Allen*, 28 *Conn.*, 102. *Dorsey vs. Gilbert et al.*, 11 *G. & J.*, 87. *State vs. Mayhew*, 2 *Gill*, 497. *Smith on Constitutional Law, sec.* 382. *Sedgwick on Statutory Law, p.* 198–202. All these authorities establish the proposition that defective contracts may be confirmed, and even that contracts absolutely made void to all intents by the statutes in force at the time, may be set up and made valid, for all civil purposes, retrospectively. *Hess vs. Werts*, 4 *S. & R.*, 356. *Bleakney vs. Farmers & Mechanics Bank*, 17 *S. & R.*, 64. *Baugher et al. vs. Nelson*, 9 *Gill*, 306. "Contracts void by statutory policy may be made good retrospectively and enforced." *Johnson vs. Bentley*, 16 *Ohio Rep.*, 104. *Wilson vs. Hardesty*, 1 *Md. Ch. Dec.*, 66.

See also: *Langdon vs. Strong*, 2 *Verm.*, 258. *Tate vs. Stoultzfoos*, 16 *Serg. & Rawle*, 37. *Mercer vs. Watson*, 1 *Watts*, 330, 335. Same case, *in* 8 *Peters*, 88. *Lawrence vs. Heister*, 3 *H. & J.*, 377. *Partridge vs. Dorsey, Id.*, 303. *Bank of Ala., vs. Dalton*, 9 *How.*, 523. *Mason vs. Haile*, 12 *Wheat.*, 378. *Mayor, &c. of Baltimore vs. State &c.*, 15 *Md. Rep.*, 479 and 453. *Cromwell vs. State*, 12 *G. & J.*, 257. *King vs. Southgate*, 8 *Doug.*, 659. *State vs. B. & O. R. R. Co.*, 12 *G. & J.*, 400. 3 *Story Com. on Constitution, sec.* 139. *Lycoming vs. Union*, 3 *Harris (Pa.) Rep.*, 171.

The adverse cases in other States, are not adopted in principle in this State, and are not binding here. 46

*Maine,* 514. 2 *Greenl. Rep.,* 288. 2 *Dutcher,* 22; and the other cases cited.

The case in 9 *G. & J.,* 181, cited on the other side about curing a defective manumission deed, is inapplicable, because there could be no contract with a slave by our laws, and there had also been a sale. And so is the case of *Mayor and City Council of Baltimore vs. Wilderman,* (8 *Md. Rep.,* 555.) See also 4 *Am. Law Regr.,* 526, and 1 *Id.,* 33.

Vested rights would seem to be most impregnable when a party has a perfect legal right to property under existing laws, and by the final and irreversible action of the Court. And yet these rights have often been invaded and set aside practically for ever, by retrospective legislation in this State, justified by no other principle but moral considerations of natural right and justice. *Gover vs. Hall,* 3 *H. & J.,* 46, 50, 52. *Davis vs. Calvert,* 6 *,G. & J.,* 297. *Vanness vs. Vanness,* 6 *How.,* 689. *Calvert vs. Williams,* 10 *Md. Rep.,* 486. *Proul vs. Berry,* 2 *Gill,* 150. *Balto. & S. R. R. Co. vs. Nesbitt,* 10 *How.,* 400.

The other points argued by the counsel of the appellants, not having been passed upon by the Court, are omitted.

*Thomas S. Alexander* and *Wm. H. Tuck,* for appellees, argued:

1st. That the marriage, though celebrated in Washington, was void on two grounds:

*A.* The first section of the Act of 1777, ch. 12, in terms, avoids all marriages within the prohibited degrees, and the sixth section punishes persons who may leave the State for the purpose of marrying contrary to the Act, in the same manner as if they married within the State.

It follows that such a marriage is also void, because where an act is punished by the law, it is in effect a prohibition against committing the act, and being prohibited,

the act is void. *Bartlett vs. Viner, Carthew,* 252. 1 *Parsons on Cont.,* 381. *Mitchell vs. Smith,* 1 *Binney,* 117. *Dickson vs. Dickson,* 1 *Yerger,* 115. *Seidenbender vs. Charles,* 4 *S. & R.,* 159. *Bancroft vs. Dumas,* 21 *Ver.,* 461. *Roby vs. West,* 4 *N. H.,* 287. 10 *Bingham,* 49, (25 *Eng. C. L. Rep.) Att'y Gen'l vs. Hill,* 2 *M. & W.,* 157. *Sussex Peerage,* 11 *Cl. & Fin.,* 85.

*B.* The Act of 1777, ch. 12, was in force in Washington at the time of the marriage; and if the marriage was void there, it is void every where. Act of Congress, 27 February 1801. *Story Confl. Laws, sec.* 113. 2 *Kent, sec.* 39, *p.* 458. *United States vs. McCormick,* 1 *Cranch C. C. Rep.* 593. *Confl. Laws,* 112, 113, *secs.* 114. 2 *Kent Comm.,* 458. 2 *Parsons on Cont.,* 104. *Shelford on Mar. & Div.,* 123.

We are strengthened in these conclusions by the decisions of the English Courts in the construction of the *Stat.* 5 and 6 *Wm.* 4, *ch.* 54, which declares that marriages between persons related within the prohibited degrees, shall be absolutely null and void. It is quite settled that by the provisions of this statute, an incestuous marriage is simply void. *The Queen vs. Chadwick, &c.,* 11 *A. & E., n., sec.* 173. *The Queen vs. Brighton,* 1 *Best & Smith,* 447; and the authority of those cases is the more cogent; since the English statute, whilst it converted consanguinity and affinity into civil disabilities, did not disturb the jurisdiction of the Ecclesiastical Courts to entertain a suit for the nullity of an incestuous marriage.

2nd. But, though valid in Washington, it will be treated as a nullity in the Courts of this State, because the parties left their domicil here, and went there to be married, in evasion of our policy on the subject of marriage. According to some writers, a marriage celebrated in another State, even to evade the laws of the domicil where such marriages are prohibited, is valid; but all agree, that there are exceptions, though differences exist

as to the extent to which the exception has been or ought to be carried. Polygamy and incest are admitted to be within the exception. The reason is, that the community where the parties reside, and where all the consequences of their act are to be seen and felt, have an interest in being protected against such immoral and pernicious examples. The rule in England appears to be this: The *lex loci contractus* will prevail, "unless when it would work injustice, or be *contra bonos mores* or repugnant to the settled principles and policy of its own laws." *Confl. Laws*, 85, 86, 87, 98, 119, 114. 2 *Kent*, 458–59. 2 *Parsons*, 104, '5, '6, '7, '8 '9. 1 *Parsons*, 565. *Shelford*, 107, '8, '9, 126, 127, 128. 1 *Bl. Comm.*, 435. *Doe vs. Vardill*, 5 *B. & C.*, 438. *Munro vs. Sanders*, 6 *Bligh*, 468. *Williams vs. Oates*, 5 *Iredell*, 535. *True vs. Ranny*, 1 *Foster*, 55. *Sneed vs. Ewing*, 5 *J. J. Marsh*, 489. 1 *Parsons*, 565.

As a general rule, the validity of a contract is governed by the law of the place where the contract is entered into. But if the contract made in one place is to be performed in another, its validity must depend on the law of the place of performance. *De Sobry vs. De Laister*, 2 *H. & J.*, 228.

It is by the comity of nations merely, that our State recognizes and enforces rights acquired under the laws of another State. It is "only in the silence of any positive rule affirming or denying, or restraining the operation of any foreign laws, that the courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests." "A nation will not suffer its subjects to evade the operation of its own fundamental policy or laws; or to commit fraud in violation of them by any acts or contracts made with that design in any foreign country; and it will judge for itself how far it will adopt, and how far it

will reject, such acts or contracts. *Gardner vs. Lewis*, 7 *Gill*, 292.

In *Thrasher vs. Everhart*, 3 *G. & J.*, 244, it has been declared that the *lex loci* will be respected unless it would be dangerous, against public policy, or of immoral tendency to enforce it here; *vide* also, *Wilson vs. Carson*, 12 *Md. Rep.*, 75.

It may be concluded, therefore, that citizens of Maryland, and actually domiciled therein, cannot be permitted to go thence into another State for the purpose of entering into a contract there which is prohibited by our law, and with intent of returning into Maryland, and there practising and enjoying the rights denied to them under that contract. See also upon this point: *Conway vs. Beasly*, 3 *Hagg. Eccl. R.*, 630. *Lolly's Case*, 1 *Russ. & Ryan*, (*Cr. Ca.*) 236. *Le Breton vs. Nonchet*, 3 *Martin*, (*La.*,) 60. 1 *Pars. on Cont.*, 565.

3rd That the validity of this marriage may be questioned in this suit. It is not a collateral inquiry. The defendants' right depends on the marriage, and marriage *vel non* is the issue which must be passed upon. This is common in our Courts. If plaintiffs sue as husband and wife, the marriage must be proved. If parties are sued in that character, the marriage is in issue. Mrs. Gaines' case is an illustration, where the prominent inquiry was, whether she was the child of a valid marriage? It is not necessary to have the marriage declared void. The 15th sec. of 1777, ch. 12, was designed to afford to the parties an opportunity of being released from the contract by designating a tribunal where such relief could be had. Being void under the statute, the invalidity may be shewn in any case, just as if there had been a prior marriage, or any other fact avoiding the marriage *ab initio*. *Poynter on Mar. and Div.*, 154. *Shelford*, 481.

4th. That the Act of 1860, ch. 271, has no effect on the rights of the appellee.

It is not necessary to shew that this Act is null for all purposes. It may have effect for some, and be ineffectual as to others.

In the case of *Crane vs. McGinnis*, 1 *G. & J.*, 464, an Act of Assembly was declared effectual as a divorce, but void as to the alimony allowed.

All that we need shew here is, that this Act has no power to divest the property from the appellee which he acquired by the death of his uncle.

Retroactive laws are not favored. They are strictly construed. They are generally unjust, and neither accord with sound legislation, nor the fundamental principles of the social compact. *Calder vs. Bull*, 3 *Dallas*, 397.

Even where there is no prohibition on the power of the Legislature by the State Constitution, there are certain limits which that department of Government cannot pass. *Fletcher vs. Peck*, 6 *Cranch*, 135. *Regent's case*, 9 *G. & J.*, 408. 3 *Story's Com.*, 268.

But the 21st Article of the Bill of Rights protects this party against the exercise of such a power. "No freeman ought to be deprived of his life, liberty or property, but by the judgment of his peers or by the law of the land."

If the law has the effect to take away the property, though not declared so in terms, the principle applies.

Retroactive laws have been passed to make good contracts which, though not declared void by law, would have failed of effect for want of proper forms of proceedings, and where, but for such curing laws, injustice would have been visited on others.

"They are remedial in their nature to give effect to existing rights." *Wilkinson vs. Leland*, 2 *Peters*, 627, 661. 8 *Curtis*, 238.

But where the effect is to take away any vested rights they are not enforced. See case last cited and *Story on Constitution*, 266.

BOWIE, C. J., delivered the opinion of this Court. BARTOL, J., dissenting.

Few questions are more interesting, or more important to society, than those presented by this appeal,—viz:—the validity of marriages between persons within the prohibited degrees, and the power of the Legislature, by retroactive enactments, to restore an inheritable quality to persons, otherwise incapable of taking.   For the first time since its passage, as far as the records of this Court inform us, the interpretation of the Act of February 1777, ch. 12, entitled, "An Act concerning Marriages," is brought in question.   The counsel, with an ability and earnestness worthy of the magnitude of the subject, have exhausted the resources of research and argument, to illustrate their views, and contributed much to enable us to arrive at satisfactory conclusions.   The leading propositions discussed were:

1st.  Was the marriage between Robert and Martha Harrison, absolutely void, or only voidable?

2nd.  If avoidable, did the Act of 1860, ch. 271, cure the incapacity of the contracting parties, and impart to the issue of the marriage, the faculty of taking as distributees and heirs at law?

In the first proposition is included the minor one, whether the marriage being celebrated in the District of Columbia, was within the operation of the first section of the Act.   The sections important to the consideration of this case, are as follows:

"An Act concerning Marriages."

"1. If any person within this State shall hereafter marry with any person related within any of the degrees of kindred or affinity expressed in the following table, such marriage shall be void."   ·

"2. That if any person shall hereafter marry with any person related within the three degrees of lineal direct consanguinity, or within the first degree of collateral

consanguinity, each of the parties on conviction thereof in the General Court shall forfeit and pay £500, or be banished this State for ever; and if any person shall hereafter marry with any person related within any other of the degrees of kindred, or within any of the degrees of affinity, each shall forfeit £200."

"6. If any person shall go out of this State and there marry with any person belonging to this State, contrary to this Act, each of said parties shall be liable to the same punishment or penalty, as if the offence had been committed within this State."

14. That the Chancellor shall and may hear and determine all claims for alimony, in as full and ample manner, as such causes could be heard by the laws of England, in the Ecclesiastical Courts there. ·

"15. That the General Court may inquire into, hear and determine, either on indictment, or petition of either of the parties, the validity of any marriage, and may declare any marriage contrary to the table in this Act, or any second marriage, the first subsisting, null and void; and on appeal, the depositions and evidence given in the cause, shall be transmitted with the record to the Court of Appeals, and thereupon such cause shall be heard, determined and adjudged *de novo*." The sections not quoted relate to the celebration of marriages, the persons by whom celebrated, and the places, churches, or chapels where celebrated, and the banns and licenses—and penalties for violating the same.

*1st Point.*—The Canon and Civil Law, regulating marriages, was a part of the Common Law, administered by ecclesiastical and civil tribunals in England, and transplanted to the colonies by our ancestors, without introducing corresponding Courts to enforce them. In the first year of the organization of the State Government, 1777, ch. 12, the General Assembly passed the Act entitled "An Act concerning Marriages." This Act was

declaratory of the Canon as a part of the Common Law, prohibiting marriages between persons related in such degrees of consanguinity and affinity as previously prevented their lawfully joining in matrimony. The disabilities enumerated, are all canonical disabilities, and not those known to the law as civil disabilities. Canonical disabilities were such as rendered the marriage voidable and not void. They require the judgment of an Ecclesiastical Court, during the lives of the parties, to make them effective, as causes of a divorce. On the other hand civil disabilities, such as arose *"pro defectu concensus,"* for want of a capacity to contract, or physical infirmity, *ipso facto* avoided the marriage without the action of the Courts. When the Legislature declared by Statute, that persons laboring under canonical disabilities should not marry under certain penalties, but such marriages should be void, and gave jurisdiction to the General Court to hear and determine upon such marriages, it is to be supposed they designed to put persons laboring under such disabilities, in the same position they were at Common Law, viz: they should be void, when established by the judgment of a Court, in the life of the parties to the marriage, not to confound canonical and civil disabilities, and destroy the distinction between them. Ecclesiastical judgments were pronounced *"pro salute animœ,"* to vindicate the divine law, not to assert the rights of property, and therefore were limited to the lives of the parties. The illicit union being dissolved by death, no subsequent proceedings could afterwards affect the rights of the issue. If it was the purpose of the Act of 1777, to convert canonical disabilities into civil disabilities, and make such marriages null and void absolutely, the provisions of section fifteen were superfluous and useless. All the objects which the law would accomplish consistently with equity and justice, are obtained by interpreting these sections collectively, in consonance with the effect

of such disabilities, when established by their proper tribunals; and consequences degrading to society and unjust to innocent persons, are avoided by this construction. The Legislature, by the Acts of 1785, ch. 35, and 1790, ch. 20, ratified and confirmed retrospectively, the marriages which the Act of 1777, ch. 12, had declared void, and this, as was urged in argument, without any reservation of vested rights. These Acts being in *"pari materia,"* are to be construed together, as parts of one system. The distinction between void and voidable, was not unknown to the legislators of that day. Such enactments would not have been made, if their provisions were deemed nugatory. Cotemporaneous legislation is the best standard of the meaning of laws. When a marriage is declared to be void, it does not necessarily mean void *"ab initio."* Reason and justice would imply, it was void from the time its nullity should be pronounced by a Court of competent jurisdiction, not that it should be so construed whenever brought incidentally in question. This view of the subject is confirmed in our opinion by the course of legislation in England. There, the legal validity of marriages previous to the first Marriage Act, (26 *Geo. 2nd., c.* 33,) depended upon the doctrine of the Ecclesiastical Courts. *Shelford on Marriage and Divorce, ch. 2nd., p.* 26.

The intention of the Statutes of 25 *Hen.* 8, *ch.* 22, 28; *Hen.* 8, *ch.* 7 and 32; *Hen.* 8, *ch.* 38, was to restore the Levitical computation, and prevent the impeaching of marriages for consanguinity or affinity, without the Levitical degrees. *Shelford,* 162, 165. The Statute 26 *Geo.* 2, *ch.* 33, called the Marriage Act, was founded on the great mischiefs and inconveniences which had arisen from clandestine marriages, and to prevent them in future; hence this Act prescribed the place and modes of solemnizing marriages in England; all marriages solemnized after the 25th of March 1754, without publication of

anns or license of marriage, were made null and void to all intents and purposes whatsoever. *Shelford, ch.* 2*nd,* *p.* 30.

The Statute of 5 and 6 *William* 4, *ch.* 54, recites—That all marriages between persons within the prohibited degrees, are voidable only by sentence of the Ecclesiastical Court, pronounced during the lifetime of the parties thereto, and it is unreasonable that *the state and condition of the children of marriages between persons within the prohibited degrees of affinity, should remain unsettled during so long a period, and it is fitting that all marriages which may hereafter be celebrated between persons within the prohibited degrees of consanguinity or affinity, be ipso facto void, and not merely voidable. Shelford, ch.* 3, *p.* 156. It therefore enacts that all marriages thereafter celebrated between persons within the prohibited degrees, shall be absolutely null and void to all intents and purposes whatsoever. The provisions of this Statute, are in marked contrast with the Act of 1777. It recites the indissoluble character of marriages, for canonical disabilities in Ecclesiastical. Courts, except by sentence pronounced during the lifetime of the parties thereto. The inconvenience and unreasonableness of suspending the state and condition of the children of marriages between persons within the prohibited degrees of affinity, during so long a period; and to cure this evil, and prevent all marriages in future between persons within the prohibited degrees, in emphatic language, declares such marriages shall be absolutely null and void, to all intents and purposes whatever, not voidable. The British Statute, shows an intelligent, deliberate purpose to destroy the distinction between canonical and civil disabilities to this extent.

The Maryland Act indicates no such purpose. No Ecclesiastical Court existed here; and instead of destroying, it erected a jurisdiction with power upon petition of either of the parties, or on indictment, to inquire into,

hear and determine the validity of any marriage, and to declare any marriage contrary to the Act, null and void. It cannot escape observation, that if the Act of 1777, ch. 12, makes all such marriages void, the consequence is, the issue of all such marriages is bastardized, and the saving of the rights of children and widows, under the distinction between voidable and void marriages, which the canon law protected, unless the marriage was dissolved during the joint lives of the parties, is lost.   Such a construction is so pregnant with serious consequences, as not to be adopted without the most cogent and conclusive authority.   The chief mischief to be corrected, was, the intermarriage of persons within the prohibited degrees. There were no Courts in existence to take cognizance of such offences.   A new Government was just being organized, and our connection with the mother country dissolved.   We had just declared "that the inhabitants of Maryland are entitled to the Common Law of England, and the benefit of such English statutes as existed on the 4th of July 1776, and which by experience had been found applicable."   The Marriage Acts were not among these.   It was therefore necessary to re-enact the Canon Law as part of the Common Law, not with the design to increase the penalties of their violation, nor to punish the innocent for the guilty, nor to dissolve marriages after the death of the parties, but to create a forum where the Canonical disabilities could be enforced during the lives of the parties, and with tender regard to the condition of the unfortunate issue.

"It is not to be presumed that the legislature intended to make any innovation upon the Common Law, further than the case absolutely required.   The law rather infers that the Act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced; for if the Parliament had had that design, it is naturally said they would have expressed it."   *   *   *

"By the Statute *de donis*, it was enacted, That a fine levied of entailed lands *'ipso jure sit nullus,'* yet the construction was, that such fine should not be a nullity, but only a discontinuance." *Dwarris on Statutes*, 695. "When a statue alters the Common Law, the meaning shall not be strained beyond the words, except in cases of public utility, when the end of the Act appears to be larger than the enacting words." *Ibid*.

The Act of 1777, ch. 12, being penal in its character, must be taken strictly "in the point of defining and setting down the fact and the punishment." The Statute 5 *Eliz.*, *ch.* 4, *sec.* 41, says all indentures of apprenticeship, made otherwise than is by that Act directed, shall be clearly void in law to all intents and purposes whatsoever." C. J. Mansfield observed: "The words of the 41st section certainly at first startle one. Yet there have been many cases cited which say that indentures which do not conform to the Act shall be only voidable and not void. If the word voidable were applied to adults it would be extremely strange; with respect to infants, if applied to them, one can understand it. In all those cases the question arose with respect to the rights of infant apprentices; but there has been no case cited, when the doctrine that the contract is voidable not void, is applied to the case of a master, and it would be very wonderful if there were." The acts of the infants under the Act of *Elizabeth*, are incomparably less important than those of the issue under the Marriage Act; and if words of stronger import were relaxed to shield and preserve the former, words of less force may be restricted by the general provisions of the Act, and those *in pari materia* to save the latter from disseisin and bastardy.

"There is in our books, great looseness, and no little confusion in the use of the terms *void* and *voidable*, growing perhaps in some degree out of the imperfection of language. There are at least some kinds of defects which

are included under these expressions, while we have but those two terms to express them all." 2 *Kent Com.*, 234. 7 *Bac. Ab.*, 64. "Void and Voidable."

"1st. Proceedings may be wholly void, without force or effect as to all persons and for all purposes, and incapable of being or being made otherwise. 2nd. Things may be void as to some person and for some purposes, and as to them, incapable of being otherwise, which are yet valid as to other persons, and effectual for other purposes. 3rd. Things may be void as to all persons, and for all purposes, or as to some persons and for some purposes, though not so as to others, until they are confirmed; but though said to be void, they are not so in the broadest sense of that term, because they have a capacity of being confirmed, and after such confirmation, they are binding. For this kind of defect, our language affords no distinctive term. They are strictly neither void, that is mere nullities, nor voidable, because they do not require to be avoided; but until confirmed, they are without validity. They are usually spoken of as void, and as usage is the only law of language, they are so called correctly. It is therefore always to be considered an open question, to be decided by the connexion and otherwise, whether the term void is used in a given instance in one or the other of these, in some respects dissimilar senses." *State vs. Richmond*, 6 *Foster*, (*N. H.*,) 238.

By the 26 *Geo.* 2, ch. 33, sec. 8, all marriages solemnized contrary to that Act "shall be null and void to all intents and purposes whatsoever."—"In the case of *Crompton vs. Bearcroft, Bul. N. P.*, 113, cited in *Bac. Abr.* 459, note a, (December 1st 1768,)—the appellant and respondent both being English subjects, and the appellant under age, ran away without the consent of her guardian, and were married in Scotland, and in a suit brought in the Spiritual Court to annul the marriage, it was holden, that the marriage was good." The anno-

tator of *Bac. Abr.* adds: "If Gretna Green marriages were invalid according to English law, and dependant for validity solely on the Scotch law, there would seem to be ground to doubt the soundness of the decisions holding them valid; for it is apprehended that, when parties merely pass into Scotland to make the contract of marriage, and immediately return to England, the law of England properly governs the contract, according to Lord Mansfield's observations in *Robinson vs. Bland,* 2 *Burr,* 1097, and according to the principle laid down by *Huber. De Confl. Legum*" etc., 6 *Bac. Abr.*, 469, note *a.*

When it is considered that the table of prohibited degrees, adopted by the Marriage Act, embraced both lineal and collateral relations, those by consanguinity, as well as affinity, and pronounced them alike void, without regard to the degree of consanguinity or affinity; it is impossible to presume that the word "*void*" was used in its most absolute and unrestricted sense. The 14th section recognizes the existence of the Ecclesiastical Courts in England, and confers upon the Chancellor, in all causes for alimony, power to hear and determine in as ample a manner as such causes could be heard in the Ecclesiastical Courts there. Is it a forced construction to say, that when in the 15th section it authorizes the General Court to inquire into, hear and determine either on indictment or petition of either of the parties, the validity of any marriage, and to declare any marriage contrary to the table, null and void, it was intended that the same rules which prevailed in the Ecclesiastical Courts in such cases, should prevail in the General Court, and until such decree or judgment of the General Court, the marriage should not be void but voidable.

The Act evidently imports there should be action in the lifetime of the parties, and requires upon appeal, that "the depositions and evidence given in the cause, shall be transmitted with the record to the Court of Appeals, and

thereupon such cause shall be heard and adjudged *"de novo."* Why so much care for the living, if after death, the innocent issue, when all the evidence has been lost, may be pronounced illegitimate, and deprived of their patrimony. It is not for human tribunals to visit the sins of the parents upon the children. We hold, therefore, that the word void, is to be understood void upon judgment or decree, for that purpose found or passed, and not *"ipso facto"* void.

*2nd Point.*—A series of decisions of this Court, upon the constitutionality of laws, enacted by the General Assembly, has established these principles of construction. A Legislative Act should not be pronounced unconstitutional or invalid in a doubtful case, where the doubt is *"bona fide"* and well founded. It is the exercise of a judicial power of a grave and delicate nature, which can only be warranted in a clear case. *Regent's Case,* 9 *G. & J.,* 383. *Doyle vs. Comm'rs, &c.,* 12 *G. & J.,* 438. *Comm'rs of Public Schools of A. Co. vs. The County Commr's,* 20 *Md. Rep.,* 439.

"A power exercised by the General Assembly from the adoption of the Constitution to the present time, ought to be deemed almost conclusive evidence of its possession by that body." A cotemporaneous construction of the Constitution of such duration, continually practised under, and through which many rights have been acquired, ought not to be shaken but upon the ground of manifest error and cogent necessity. *State vs. Mayhew,* 2 *Gill,* 468.

The Act of 1860, ch. 271, enacts: "That all marriages heretofore made and celebrated in or out of this State, by and between persons related within the following degrees of affinity, to wit: a man and his niece, or a woman and her nephew, be and the same are hereby confirmed and made valid to every intent and purpose, from the time of the celebration of such marriages respectively; and every such marriage shall be held and taken by all Courts of

this State to be good and sufficient in law, to all intents and purposes: and this section shall be in force from the day of its passage." This Act is said to be retroactive in its effect, transcending the limits of legislative power, prescribed by the nature of society, and of government, and unconstitutional because it destroys vested rights. For which various authorities are cited. It is impossible to reconcile all the adjudged cases on this subject. Our province is to ascertain and announce the law of this State, following as closely as possible, the principles and precedents established by our own Courts. There is no clause in our Constitution inhibiting retroactive laws in civil cases. The prohibition of "*ex post facto*" laws applies only to criminal cases. "There are many laws of a retrospective character, which may be passed constitutionally, by State Legislatures, however unjust, oppressive or impolitic they may be." 2 *Story Const. Law, sec.* 1398, *and note* 1, and authorities there cited. Although retrospective laws are said to be generally unjust, we do not concur in their indiscriminate condemnation. A large class of these laws are eminently wise, conservative and necessary, nor are they, because retrospective, essentially judicial. The Acts of 1785, ch. 35, and 1790, ch. 20, repealing certain clauses of the Act of 1777, ch. 12, prohibiting marriages between certain degrees of affinity and consanguinity, confirmed *to all intents and purposes* the marriages which had in the mean time been made contrary to the Act repealed. The Act of 1860, ch. 271, after a lapse of seventy years, is a legislative exercise of the same healing power. Whether the objects of its exercise in the last instance, were as meritorious as those of the first, is not the part of judicial duty to determine. The subject-matter and the power were the same. If the former were constitutional enactments, the latter must necessarily be so. Marriage, the subject of these Acts of legislation, although it has been tersely

called the mother, not the child of society, is moulded by municipal law. "It is a contract of a peculiar nature, and differing in some respects from all other contracts, so that the rules of law which are applicable in expounding and enforcing other contracts, may not apply to this. It differs from other contracts in this, that the rights, obligations, or duties arising from it, are not left entirely to be regulated by the agreements of parties, but are to a certain extent, matters of municipal regulation, over which the parties have no control by any declaration of their will. They are regulated in many important particulars by the laws of every civilized country, and such laws must be considered as forming a most essential part of the public laws of the country." *Shelford on Mar. and Div.*, 17. These laws, like those of Divorce, must be viewed "*as regular exertions* of legislative power," emanating from the General Assembly from the earliest times. *Crane vs. Meginnis*, 1 *G. & J.*, 474. *Wright vs. Wright's Lessee*, 2 *Md. Rep.*, 448.

The right to confirm, is the necessary corollary of a power to dissolve marriage by divorce. The consequence of which is, incidentally, authority to determine the *status* of the issue of the marriage. In this State the Legislature has exercised for three-fourths of a century the most plenary power over the marriage contract. It cannot be predicated of such legislation, because it incidentally affects the rights of property, that it conflicts with indefeasible or vested rights. Heirship and succession are incidents of marriage, and follow its regulation. Where the parties contracting marriage labor under legal disabilities, the contract is liable to be dissolved by the Courts or affirmed by the Legislature. All standing in any degree of relationship are subject to be affected by anything which operates on those they are related to. Their rights are inchoate not vested. The exercise of similar powers by the General Assembly for various pur-

poses, affecting incidentally the rights of others retro-actively, is shown by the cases cited by the appellant's counsel, up to a very recent date. Vide *Lawrence & Wife vs. Heister et al.*, 3 *H. & J.*, 371. *Dulany & Wife vs. Tilghman*, 6 *G. & J.*, 461. From *Crane vs. Meginnis*, in 1829, to *Wright vs. Wright's Lessee*, in 1852, the action of the Legislature in matters of divorce, was judicially recognized as a regular exercise of legislative power, not-withstanding the Act of 1841, ch. 262, had, in the mean time, invested the Chancellor or any County Court of this State as a Court of Equity, with jurisdiction of all appli-cations for divorces, *a vinculo matrimonii.* The Act to divorce Jane E. Wright from her husband Samuel J. Wright, was passed without notice to him of the pro-ceedings, and divested him of his marital rights in the wife's land. Analogous cases to those already cited, are the special Acts of Assembly, conferring the rights of appeal in pending cases, which have been recognized in various instances, from *Davis vs. Calvert,* 5 *G. & J.*, 269, in 1831, to the *State vs. Northern Central R. R. Company,* 17 *Md. Rep.*, 8, in 1861. If it were necessary, numerous instances in our sister States might be added to the cata-logue, establishing the position that such legislation is neither extraordinary, unconstitutional nor unjust; but conservative, essential and salutary, being the only adequate means of healing or preventing inevitable wrongs public and private.

*The Regent's case,* 9 *G. & J.*, 365, relied on by the appel-lees to sustain their position, that the Act of 1860 was opposed to the fundamental principles of right and justice inherent in the nature and spirit of the social compact, bears no analogy to the present in any of its features. That was an attempt to abolish a private corporation, and invest another with all the franchises and property of the corporation to be abolished. It was a legislative ouster affecting that particular body, in the nature of a sentence,

rather than a law. No charter is violated by the Act in question in this case; it does not exhaust itself upon any particular persons, nor are the fundamental principles of right and justice impaired. The confirmation of defective deeds, imperfect contracts or of marriages contrary to the provisions of pre-existing laws, was not in that or any of the cases cited herein, deemed to be within the constitutional power of the General Assembly; but the exertion of the power in the particular case, was adjudged unconstitutional for the reasons assigned. It is enough to distinguish this from the cases cited by the appellee, that this Act confirms and does not infringe, ratifies but does not divest, quiets the possession and assures the title of children, born in wedlock, by giving it the sanction of law—*"hæres est quem nuptiæ demonstrant."*

It follows from the preceding views, that the prayer granted by the Court below, assuming that the marriage between Robert and Martha Harrison was void *ab initio*, and not made valid by the Act of 1860, ch. 271, was in our judgment improperly granted, and the judgment below must be reversed. This conclusion being decisive of the action, it is unnecessary to discuss the minor points mooted in the argument of the cause.

*Judgment reversed.*

(Decided June 3rd 1864.)