## SUPERIOR COURT OF BALTIMORE CITY

Filed January 11, 1893.

BALTIMORE BELT RAILROAD COMPANY

VS.

CATHARINE B. TURNER.

*William A. Fisher* and *W. Irvine Cross* for Railroad.

*Arthur W. Machen* and *Andrew C. Trippe* for Turner.

RITCHIE, J.—

The ordinance requiring grades of certain streets to be established before the construction of the Belt Rail-

road does not prohibit the condemnation of the right of way before such establishment.

Notice signed and served by the sheriff at the request of the company is sufficient.

In respect to the quantity of land needed, the Court will accept the statement of the corporation, if reasonable and made in good faith.

The local law does not require condemnation juries to be summoned from the jury book.

Inadequate damages.

This case comes up on exceptions by Catharine B. Turner to the ratification of an inquisition had by the Baltimore Belt Railroad Co. for the purpose of condemning a right of way through her property. The numerous exceptions may be summarized as follows: (1) That the company has no power to condemn this property until the grades of certain streets have first been established; (2) That the law under which the proceedings were had is unconstitutional in that it fails to provide for notice to the owner; (3) That the notice given was not valid; (4) That the company is attempting to take more land than the public use requires; (5) That the jury was not summoned from the jury book; (6) That the damages are inadequate.

THE GRADES.—This property fronts on Quaker lane. On the street plat of the "Belt," made under the Act of 1874, Ch. 441, and before its annexation. Quaker lane (now thirty feet wide) is laid down as a proposed avenue to be sixty feet wide and called Montebello, and two streets, if opened according to such plat would run through this property, each of which would be crossed by the railroad, but no street is now opened through it.

It is contended that the railroad, under the terms of Ordinance 1890, No. 83 (authorized by Act 1890, Ch. 139) has no power to condemn through this property until the grades of Quaker lane and these proposed streets have been established. The ordinance referred to gave the consent of the Mayor and City Council to the construction of this railroad through the city on the condition, among others, "that before the said railroad shall be *constructed* across the line of any street opened or contemplated, of which the grade is not yet established,

it shall be the duty of the City Surveyor to establish the grade of such street, and of such other streets in the immediate vicinity as he and the City Commisisoner may determine to be necessary, in such way as to enable the railroad to be carried either under or over the same by a reasonably practicable grade." Without deciding whether Quaker lane is a street within the meaning of the ordinance, or what is meant by a contemplated street, it is clear, in my opinion, that this condition refers only to the construction of the road, and not to the previous acquisition of the right of way either by condemnation or deed. This exception therefore will be overruled.

NOTICE.—The objection that Section 167, of Art. 23, under which these proceedings were had, does not provide for notice, has been disposed of by the case of the Belt R. R. vs. Baltzell, decided by the Court of Appeals since this exception was filed.

Notice, however, was given, and under the authority of the company, but it is contended that it was not a valid notice because signed by the sheriff instead of by some officer of the company. The act provides no form for the notice, and the notice in question fully answered the purpose of notice; the owner was informed, she appeared and took part in all the proceedings. I can see no ground for objecting to it, because, at the request of the company, it was signed and served by the sheriff, and I will overrule this exception.

QUANTITY OF LAND TAKEN.—The exceptant claims that under the general incorporation law Section 161, the company is restricted to the construction of two tracks, and has no power to condemn more land than is necessary for two tracks, but that in fact it intends to build four main tracks through this property and is seeking to take land enough for that purpose. The quantity proposed to be taken at this part of the road is enough for four tracks, but the company, while denying that it is restricted to two main tracks, insists that the two additional tracks are for sidings. Section 161 and the ordinance give ample authority for the construction of necessary sidings, and the evidence shows that large travel and traffic are

expected, that only two tracks can be laid through the tunnels, and that because of the necessity of giving the right of way to passenger travel, large storage room will be necessary for freight trains, and one of the chief officers of the company testifies that two sidings are necessary at this point, and that the purpose of the company is to use the additional tracks as sidings. One tunnel of two hundred feet passes under the York road and Quaker lane is to be crossed by a bridge, and it thus, from the plans of the road, seems reasonable that sidings should be needed between these points, and there is no testimony to contradict the alleged necessity and purpose. The law upon this point in respect to the quantity of land needed seems to be that the Court will accept as satisfactory evidence the statement of the proper officers of the company, if it has a reasonable appearance of accuracy, and the company seems to be acting in good faith.

Kemp vs. South Eastern R. R., L. R. 7th Ch. 364.

1 Woods Railway Law, 648.

Judge Miller in C. & P. R. R. vs. Pa. R. R., 57 Md. 280.

THE JURY.—It is claimed in the next exception that the proceedings are invalid because the jury was not summoned from the jury book prepared under the local jury law by the Judges of the Supreme Bench. It is shown in evidence that the jury was summoned from the inhabitants at large and not from the jury book, but it also appears that the owner, through her attorney, and without objection upon this ground, appeared on the premises, joined in striking the jury and took part in all the subsequent proceedings. If this objection were otherwise good it was thus waived.

Canal Co. vs. Archer, 9 G. & J. 497; Green vs. State, 59 Md. 126; Johns vs. Hodges, 60 Md. 215; Great Falls Co. vs. Attorney-General, 124 U. S. 599; 2 Woods Railway Law, p. 850.

This exception must therefore be overruled.

As this inquisition, however, will be set aside on another ground, and a new one ordered, it is necessary for me to construe Section 599 of the local jury law and decide whether or not condemnation juries in the City of Baltimore must be summoned from the jury book. This important question involves the regularity of other condemnation proceedings, the returns in which are now pending, and also, in certain aspects, the security of valuable rights of property heretofore acquired under proceedings similar to this. It is argued with much earnestness by the counsel for Mrs. Turner, that condemnation juries are special juries within the terms of Article 4, Section 599, of the Public Local Laws, and that in the City of Baltimore they must be summoned from the names in the jury book, and not from the inhabitants at large. This section stands in the Code of 1888 just as it was enacted in the local jury law of 1860, Ch. 308 (L. L. 1860, Art. 4, Sec. 615), and is as follows:

"All special juries authorized by law to be summoned shall be summoned by the Sheriff of Baltimore City from those whose names may be inscribed in the jury book as then revised."

The Belt Railroad was incorporated under the general law and its powers of condemnation are under Section 167, of Article 23, of the Code of 1888. Under Section 167 the Sheriff is directed, on receipt of the magistrate's warrant, to summon twenty persons, qualified to act as jurors under the general jury law, from the inhabitants *at large*, to serve as the condemnation jury; under Section 599 of the local law, if it applies, he must summon from those only whose names for the time being are on the jury book.

The term "special juries" is very broad. It is true that the term jury in a statute will generally be taken to mean a common law jury; but, as the Court of Appeals says in Belt Railroad vs. Baltzell (DAILY RECORD, December 19th, 1891), the use of this term does not necessarily mean only a common law jury when there is another sort of jury well known to the law, and it is held in that case that the term jury in Article 3, Section 46, of the Constitution of 1851, and in Article 3, Section 40, Constitution of 1867, includes a condemnation jury. It is also true that a condemnation jury is one "authorized by law to be summoned," and that in one sense it is a special jury.

On the other hand, the term jury by itself does not generally include a condemnation jury, the term special

jury is well known to the law of common law juries, and also there were juries specially provided for by the Code of 1860 (and now provided for by the Code of 1888), whose services were to be rendered in the Courts of the city, and to which the term in question might apply (Juries in the Circuit Court of Baltimore City, Code, 1860, Art. 29, Sec. 58; Juries in the Case of Insane Paupers, Art. 58, Sec. 1, and Insane Persons Charged with Crime, Art. 58, Secs. 6 and 7). The section is thus ambiguous and the usual rules of construction must be invoked in order to discover the intention of the law.

I have carefully examined the jury laws and also a large number of the acts delegating the power of eminent domain previous to 1860, but I have not found any general or local jury law which could be said to have embraced condemnation juries; nor have I found any special act conferring the power of condemnation which did not itself, either in terms or by reference, prescribe the qualifications of the persons who were to make the inquest.

By the Act of 1797, Ch. 87, the minimum age of grand and petit jurors was put at twenty-five, and by the Act of 1812, Ch. 178, the property qualification was abolished, but in no case does the legislature seem to have supposed that the qualifications of condemnation jurors were determined by the general jury law. In some acts it was expressly provided that they should be persons qualified to serve as jurors in the County Courts, but in others, and subsequent to 1797, there was no provision in respect to age, while in some the age prescribed is twenty-one years; and also, and prior to 1812, in some acts, there was no requirement of a property qualification, while in others, after 1812, and notwithstanding its abolishment in the case of petit jurors, the property qualification is still prescribed for condemnation jurors.

It thus seems to be clear that down to 1860 the condemnation jury was summoned according to the provisions of each particular act, and though well-known as a jury it was never regarded as being within the terms of any common law jury statute. The only instance prior to 1860 in which the term jury was used in any law to embrace each jury, was in the 46th Section of the Constitution of 1851, and there it is used in relation to the power of eminent domain. Such being the previous legislation and practice the local jury law of 1860, Chapter 308, was passed.

In order to discover the meaning of Section 599 in the local Code of 1888, (Section 15 of the Act of 1860) it is proper to go back to the original act and see what was its intention as shown by its language, purpose and subject matter.

There have been amendments to that Act, but none that indicate any intention to widen its scope, and if the Section in question did not under the Act of 1860 embrace condemnation juries, its interpretation will not be changed by the fact of codification.

The first thing to be noted is the title. It is viz: "An Act to amend the Code of this State by providing otherwise than as therein enacted for the selection of *grand and petit* jurors for Baltimore City."

There is nothing in the title to indicate an intention to include condemnation juries. The subject matter of the Act as disclosed by the title is the selection of grand and petit jurors, and those only.

"Although the title of an act is not a part of the enacting portion of the law, yet, by an established rule of construction, it is always resorted to, as throwing light as to the intention of the Legislature, upon doubtful and uncertain language used in the body of the law."

Bradford vs. Jones, 1 Md. 370; Kent vs. Somervell, 7 G. & J. 274; Myer vs. Car Co., 102 U. S. 11; Southerland, Sections 210-211.

But the terms of the act seem to show more plainly that it was not intended to embrace any other than common law juries, or, at most, juries which were to attend upon some one of the City Courts, and there are provisions in the law which are not applicable to condemnation juries. The first section provides that it shall be the duty of the Judges of the several Courts of the city at the annual meetings provided for; "to select the names of seven hundred and fifty persons (qualified under the law of this State) *to serve as grand and petit jurors in said city."*

I put in brackets the words "qualified under the law of this State," in order to show plainly the grammatical construction and punctuation of the original section. This reading shows the purpose of the list, and that it is the correct reading is apparent from the second section, which begins, viz: "In order to assist the said judges in making out *the list of jurors aforesaid*, the Collector shall," &c. This section assumes that the first has provided for a *list of jurors*, but unless the language be read as above indicated there is no purpose stated in the first section for which the list is to be prepared.

This section was amended by 1882, Ch. 67, but not in such a way as to change that portion of it now being considered.

Further, by section two of the original act (Sec. 595, Local Code 1888), it is provided that "no one summoned as a juror shall be excused from service except in *open Court* on good cause shown to the *satisfaction of the Court;* and if any juror summoned and not excused shall fail to attend the *said Court* until duly discharged, he shall be fined," &c.

The jurors meant by Section 15 of the Act (Sec. 599) must, like others provided for, be subject to the provisions of this section, but it is seen at once that the section is altogether inapplicable to condemnation jurors, who are not summoned to attend any Court, and of course do not present their excuses in open Court.

And by the 14th Section of the original Act, which provides for the meeting of the judges from time to time during the year for filling up the list and for the selection of juries, it is provided that "all the regulations prescribed by this law for the government of said judges, and of the sheriff or his deputy as aforesaid, in reference to jurors, shall apply to all *grand and petit jurors* to be hereafter selected and summoned for the said city during the year aforesaid."

When the section in question is thus read in connection with the whole act, it does not seem to embrace condemnation juries.

In construing a codified statute resort may be had to the terms and title of the original act.

Myer vs. Car Co., 102 U. S. 11; United States vs. Bowen, 100 U. S. 513; Sutherland, Section 156.

Co-temporaneous legislation is also an important aid in construction (Harrison vs. State, 22 Md. 468) and in this connection it is to be noted that at the same session of 1860 the Legislature conferred on the city the power to condemn for the purpose of extending its markets (L. L., Article 4, Section 640), and this law required that the jurors should be *freeholders*. The same section is in the Code of 1888, Article 4, Section 680.

As already stated the property qualification for common law jurors was abolished in 1812, and it does not seem probable that the Legislature, when requiring freeholders, would direct the sheriff to summon the jurors from a list of names made up without any regard to the ownership of property.

Many other acts conferring the same power, and operating in the city, have been passed since 1860, which are inconsistent with the theory that condemnation juries are within the local jury law. All of them indicate that the jurors are to be summoned from the inhabitants at large, and some of them expressly prescribe different qualifications from those of the general law; for instance, under 1868, Ch. 364 (Baltimore and Drum Point R. R.) they must be landowners; under 1870, Ch. 80 (Baltimore and Potomac R. R.), 1872, Ch. 71, and 1876, Ch. 90 (Western Maryland R. R.), and under 1872, Ch. 119 (Union R. R.), twenty-one years of age is sufficient; and under 1870, Ch. 68 (Patterson Park), 1868, Ch. 471 (General Corporation Law), 1870, Ch. 476 (Railroad Incorporation), and 1890, Ch. 139 (Belt R. R.), the intention seems to be clear that the sheriff shall summon from the inhabitants at large.

The uniform practice under an act is also an aid in its construction, and the important fact is shown in the evidence that under the practice in condemnation proceedings in Baltimore it has never been considered that the jurors were within the local law, and since its passage there has never been a proceeding in which the jurors were taken from the jury book.

A great number of condemnations have been had, involving much controversy both in the Court of Appeals

and in the lower Courts, but this is the first instance in which this point has been raised. A long established and uniform practice, under which valuable rights have been acquired, is not to be shaken unless manifest error and necessity require it.

Kiersted vs. State, I. G. & J. 231; Weighorst vs. State, 7 Md. 442; State vs. Mayhew, 2 Gill 487.

Where the damages in past proceedings have been paid to the true owners they would of course be estoppel, but serious questions might arise in respect to ownership and other matters if the long accepted construction of this law were to be now overthrown.

In view, therefore, of the terms of the whole act, and of the light thrown upon its intention by legislation and a uniform practice of over thirty years, I do not think that the law requires the sheriff to summon condemnation jurors from the jury book. If the Act applies to a condemnation jury it must also apply to a coroner's jury. A coroner's jury is "authorized by law to be summoned," is in one sense a special jury, and is as well-known to the law as a condemnation jury, but while each may be within the general terms of the section, neither, in my judgment, is within the intent of the law.

It is also contended by the landowner in this case that even under Section 167 (Article Corporations) condemnation jurors in Baltimore City must be taken from the jury book, on the ground that they are not "qualified to act as jurors under the laws of this State" unless their names are on the jury book. But this cannot be so. The persons whose names are placed on the list by the judges must be qualified under the laws of the State to act as jurors, and it is only because they are so qualified that their names get upon the book. Persons qualified to act will not be called on to attend the Courts unless their names are drawn from the book, but the qualifications of jurors in the city, as well as in the counties, are determined by the general law.

Albert vs. White, 33 Md. 297.

DAMAGES.—The amount allowed is $10,000. The property through which the railroad proposes to run is a rectangular tract of twelve acres, fronting one thousand feet on the west side of Quaker lane or Montebello avenue; its westernmost point is within two hundred feet of the York turnpike, and it lies immediately north of the extended lines of Huntingdon avenue. The evidence shows that it is within the range of active development, and lies favorably for the purpose of being laid off into streets and building lots; that immediately opposite, and running from the east side of Quaker lane, two streets have been laid off and built up; that Cottage avenue running eastwardly from the York road and very near the southerly line of this property, is improved with residences; that Oxford street running east from the York road and Frisby street running south from Oxford street, touch its northwest line; and that in the immediate vicinity a good deal of property has been divided into building lots and sold by the front foot.

The portion which the company proposes to take contains about one and three-quarter acres; the line of the railroad passes nearly through the center of the property, and cuts diagonally; it enters the property through a cut of eleven feet, runs to grade, and passes out by an embankment fourteen feet high at Quaker lane.

The testimony further shows that, allowing for streets and for lots 125 feet deep, an acre will give 300 front feet; that property on the east side of Quaker lane with shallow lots leased several years ago at about $1.25 a front foot; that property on Cottage avenue has been leased at $2.00 a front foot; that property fronting on York road and running east on Oxford street almost to this property has recently been sold for about $6,400 an acre.

The evidence on the part of the railroad values the whole tract at from $30,000 to $36,000. An important factor in the damages is the injury done to the rest of the property, and yet only one witness on the part of the company testifies on this point, and he estimates this injury at $4,000. Among the witnesses for Mrs. Turner are some of the most experienced real estate men in the city. Their valuations of the whole tract and estimates of damage, including in the damages the value of the land taken and the injury done to the rest of the property, are as follows: Aull, value, $60,-

000, damages, $30,000; Rogers, value, $84,000, damages, $42,000; Birckhead, value, $50,000, damages, $25,000; Clemens, Jr., value, $50,000 to $55,000, damages, $25,000; Bankard, value, $50,000, damages, $21,000; Martenet, value, $50,000 to $60,000, damages, one-third to one-half of value.

On the whole evidence, I think the damages awarded are inadequate, and I must sustain this exception, and will sign an order in accordance with the views expressed in this opinion.